# COMMODITY FUTURES TRADING COMMISSION v. SCHOR ET AL.

No. 85–621.   Argued April 29, 1986—Decided July 7, 1986*

*Together with No. 85–642, *ContiCommodity Services, Inc.* v. *Schor et al.*, also on certiorari to the same court.

O'CONNOR, J., delivered the opinion of the Court, in which BURGER, C. J., and WHITE, BLACKMUN, POWELL, REHNQUIST, and STEVENS, JJ., joined. BRENNAN, J., filed a dissenting opinion, in which MARSHALL, JJ., joined, *post*, p. 859.

*Deputy Solicitor General Wallace* argued the cause for petitioner in No. 85–621. With him on the briefs were *Solicitor General Fried, Bruce N. Kuhlik, Kenneth M. Raisler, Pat G. Nicolette, Whitney Adams*, and *Anne H. Wright. Robert L. Byman* argued the cause for petitioner in No. 85–642. With him on the briefs were *Howard R. Barron* and *Lawrence G. Weppler.*

*Leslie J. Carson, Jr.*, argued the cause for respondents. With him on the brief was *H. Bartow Farr III.*

JUSTICE O'CONNOR delivered the opinion of the Court.

The question presented is whether the Commodity Exchange Act (CEA or Act), 7 U. S. C. § 1 *et seq.*, empowers the Commodity Futures Trading Commission (CFTC or Commission) to entertain state law counterclaims in repara-

tion proceedings and, if so, whether that grant of authority violates Article III of the Constitution.

## I

The CEA broadly prohibits fraudulent and manipulative conduct in connection with commodity futures transactions. In 1974, Congress "overhaul[ed]" the Act in order to institute a more "comprehensive regulatory structure to oversee the volatile and esoteric futures trading complex." H. R. Rep. No. 93–975, p. 1 (1974). See Pub. L. 93–463, 88 Stat. 1389. Congress also determined that the broad regulatory powers of the CEA were most appropriately vested in an agency which would be relatively immune from the "political winds that sweep Washington." H. R. Rep. No. 93–975, at 44, 70. It therefore created an independent agency, the CFTC, and entrusted to it sweeping authority to implement the CEA.

Among the duties assigned to the CFTC was the administration of a reparations procedure through which disgruntled customers of professional commodity brokers could seek redress for the brokers' violations of the Act or CFTC regulations. Thus, § 14 of the CEA, 7 U. S. C. § 18 (1976 ed.),[1] provides that any person injured by such violations may apply to the Commission for an order directing the offender to pay reparations to the complainant and may enforce that order in federal district court. Congress intended this administrative procedure to be an "inexpensive and expeditious" alternative to existing fora available to aggrieved customers, namely, the courts and arbitration. S. Rep. No. 95–850, p. 11 (1978). See also 41 Fed. Reg. 3994 (1976)

---

[1] Respondents' suit was governed by the Commodity Futures Trading Commission Act of 1974, Pub. L. 93–463, 88 Stat. 1389. Congress again significantly revised the Act in early 1983. See Futures Trading Act of 1982, Pub. L. 97–444, 96 Stat. 2294. The changes effected by the 1983 amendments that are relevant to CFTC proceedings became effective only as of May 1983, and therefore do not control in this proceeding. See § 239, 96 Stat. 2327.

(accompanying CFTC regulations promulgated pursuant to § 14).

In conformance with the congressional goal of promoting efficient dispute resolution, the CFTC promulgated a regulation in 1976 which allows it to adjudicate counterclaims "aris-[ing] out of the transaction or occurrence or series of transactions or occurrences set forth in the complaint." *Id.*, at 3995, 4002 (codified at 17 CFR § 12.23(b)(2) (1983)). This permissive counterclaim rule leaves the respondent in a reparations proceeding free to seek relief against the reparations complainant in other fora.

The instant dispute arose in February 1980, when respondents Schor and Mortgage Services of America, Inc., invoked the CFTC's reparations jurisdiction by filing complaints against petitioner ContiCommodity Services, Inc. (Conti), a commodity futures broker, and Richard L. Sandor, a Conti employee.[2] Schor had an account with Conti which contained a debit balance because Schor's net futures trading losses and expenses, such as commissions, exceeded the funds deposited in the account. Schor alleged that this debit balance was the result of Conti's numerous violations of the CEA. See App. to Pet. for Cert. in No. 85–621, p. 53a.

Before receiving notice that Schor had commenced the reparations proceeding, Conti had filed a diversity action in Federal District Court to recover the debit balance. *Conti-Commodity Services, Inc.* v. *Mortgage Services of America, Inc.*, No. 80–C–1089 (ND Ill., filed Mar. 4, 1980). Schor

---

[2] Two complaints, relating to separate trading accounts, were filed on behalf of Schor and the mortgage banking company, Mortgage Services of America, Inc., of which Schor was president and 90% shareholder. The complaints contained virtually identical allegations and were consolidated at the administrative level. The Court of Appeals also consolidated the two separate petitions for review of the CFTC's final reparation order filed by Schor and Mortgage Services of America, Inc. Because the legal issues involved in the two actions are for all relevant purposes identical, we refer to Schor and Mortgage Services of America, Inc., jointly as "Schor," and to ContiCommodity Services, Inc., and Sandor jointly as "Conti."

counterclaimed in this action, reiterating his charges that the debit balance was due to Conti's violations of the CEA. Schor also moved on two separate occasions to dismiss or stay the District Court action, arguing that the continuation of the federal action would be a waste of judicial resources and an undue burden on the litigants in view of the fact that "[t]he reparations proceedings . . . will fully . . . resolve and adjudicate all the rights of the parties to this action with respect to the transactions which are the subject matter of this action." App. 13. See also *id.*, at 19.

Although the District Court declined to stay or dismiss the suit, see *id.*, at 15, 16, Conti voluntarily dismissed the federal court action and presented its debit balance claim by way of a counterclaim in the CFTC reparations proceeding. See *id.*, at 29–32. Conti denied violating the CEA and instead insisted that the debit balance resulted from Schor's trading, and was therefore a simple debt owed by Schor. *Schor* v. *Commodity Futures Trading Comm'n*, 239 U. S. App. D. C. 159, 162, 740 F. 2d 1262, 1265 (1984); App. to Pet. for Cert. in No. 85–621, p. 53a.

After discovery, briefing, and a hearing, the Administrative Law Judge (ALJ) in Schor's reparations proceeding ruled in Conti's favor on both Schor's claims and Conti's counterclaims. After this ruling, Schor for the first time challenged the CFTC's statutory authority to adjudicate Conti's counterclaim. See *id.*, at 62a. The ALJ rejected Schor's challenge, stating himself "bound by agency regulations and published agency policies." *Id.*, at 62a–63a. The Commission declined to review the decision and allowed it to become final, *id.*, at 50a–52a, at which point Schor filed a petition for review with the Court of Appeals for the District of Columbia Circuit. Prior to oral argument, the Court of Appeals, *sua sponte*, raised the question whether CFTC could constitutionally adjudicate Conti's counterclaims in light of *Northern Pipeline Construction Co.* v. *Marathon Pipe Line Co.*, 458 U. S. 50 (1982), in which this Court held that "Congress may

not vest in a non-Article III court the power to adjudicate, render final judgment, and issue binding orders in a traditional contract action arising under state law, without consent of the litigants, and subject only to ordinary appellate review." *Thomas* v. *Union Carbide Agricultural Products Co.*, 473 U. S. 568, 584 (1985).

After briefing and argument, the Court of Appeals upheld the CFTC's decision on Schor's claim in most respects, but ordered the dismissal of Conti's counterclaims on the ground that "the CFTC lacks authority (subject matter competence) to adjudicate" common law counterclaims. 239 U. S. App. D. C., at 161, 740 F. 2d, at 1264. In support of this latter ruling, the Court of Appeals reasoned that the CFTC's exercise of jurisdiction over Conti's common law counterclaim gave rise to "[s]erious constitutional problems" under *Northern Pipeline*. 239 U. S. App. D. C., at 174, 740 F. 2d, at 1277. The Court of Appeals therefore concluded that, under well-established principles of statutory construction, the relevant inquiry was whether the CEA was " 'fairly susceptible' of [an alternative] construction," such that Article III objections, and thus unnecessary constitutional adjudication, could be avoided. *Ibid.* (quoting *Ralpho* v. *Bell*, 186 U. S. App. D. C. 368, 380, 569 F. 2d 607, 619 (1977)).

After examining the CEA and its legislative history, the court concluded that Congress had no "clearly expressed" or "explicit" intention to give the CFTC constitutionally questionable jurisdiction over state common law counterclaims. See 239 U. S. App. D. C., at 166, 178, 740 F. 2d, at 1269, 1281. The Court of Appeals therefore "adopt[ed] the construction of the Act that avoids significant constitutional questions," reading the CEA to authorize the CFTC to adjudicate only those counterclaims alleging violations of the Act or CFTC regulations. *Id.*, at 175, 740 F. 2d, at 1278. Because Conti's counterclaims did not allege such violations, the Court of Appeals held that the CFTC exceeded its authority in adjudicating those claims, and ordered that the

ALJ's decision on the claims be reversed and the claims dismissed for lack of jurisdiction. *Id.*, at 161, 740 F. 2d, at 1264.

The Court of Appeals denied rehearing en banc by a divided vote. In a dissenting statement, Judge Wald, joined by Judge Starr, urged that rehearing be granted because the panel's holding would "resul[t] in a serious evisceration of a congressionally crafted scheme for compensating victims of Commodity Futures Trading Act . . . violations" and would in practical effect "decimat[e]" the efficacy of this "faster and less expensive alternative forum." App. to Pet. for Cert. in No. 85–621, p. 71a. This Court granted the CFTC's petition for certiorari, vacated the Court of Appeals' judgment, and remanded the case for further consideration in light of *Thomas, supra,* at 582–593. 473 U. S. 568 (1985). We had there ruled that the arbitration scheme established under the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA), 7 U. S. C. § 136 *et seq.*, does not contravene Article III and, more generally, held that "Congress, acting for a valid legislative purpose pursuant to its constitutional powers under Article I, may create a seemingly 'private' right that is so closely integrated into a public regulatory scheme as to be a matter appropriate for agency resolution with limited involvement by the Article III judiciary." 473 U. S., at 593.

On remand, the Court of Appeals reinstated its prior judgment. It reaffirmed its earlier view that *Northern Pipeline* drew into serious question the Commission's authority to decide debit-balance counterclaims in reparations proceedings; concluded that nothing in *Thomas* altered that view; and again held that, in light of the constitutional problems posed by the CFTC's adjudication of common law counterclaims, the CEA should be construed to authorize the CFTC to adjudicate only counterclaims arising from violations of the Act or CFTC regulations. See 248 U. S. App. D. C. 155, 157–158, 770 F. 2d 211, 213–214 (1985).

We again granted certiorari, 474 U. S. 1018 (1985), and now reverse.

## II

The Court of Appeals was correct in its understanding that "[f]ederal statutes are to be so construed as to avoid serious doubt of their constitutionality." *Machinists* v. *Street*, 367 U. S. 740, 749 (1961). See also *NLRB* v. *Catholic Bishop of Chicago*, 440 U. S. 490, 500–501 (1979). Where such "serious doubts" arise, a court should determine whether a construction of the statute is "fairly possible" by which the constitutional question can be avoided. *Crowell* v. *Benson*, 285 U. S. 22 (1932). See also *Machinists* v. *Street, supra,* at 750. It is equally true, however, that this canon of construction does not give a court the prerogative to ignore the legislative will in order to avoid constitutional adjudication; "'[a]lthough this Court will often strain to construe legislation so as to save it against constitutional attack, it must not and will not carry this to the point of perverting the purpose of a statute . . .' or judicially rewriting it." *Aptheker* v. *Secretary of State*, 378 U. S. 500, 515 (1964) (quoting *Scales* v. *United States*, 367 U. S. 203, 211 (1961)). See also *Heckler* v. *Mathews*, 465 U. S. 728, 742–743 (1984).

Assuming that the Court of Appeals correctly discerned a "serious" constitutional problem in the CFTC's adjudication of Conti's counterclaim, we nevertheless believe that the court was mistaken in finding that the CEA could fairly be read to preclude the CFTC's exercise of jurisdiction over that counterclaim. Our examination of the CEA and its legislative history and purpose reveals that Congress plainly intended the CFTC to decide counterclaims asserted by respondents in reparations proceedings, and just as plainly delegated to the CFTC the authority to fashion its counterclaim jurisdiction in the manner the CFTC determined necessary to further the purposes of the reparations program.

Congress' assumption that the CFTC would have the authority to adjudicate counterclaims is evident on the face of

the statute. See, *e. g.*, 7 U. S. C. § 18(c) (providing that before action will be taken on complaints filed by nonresident complainants, a bond must be filed which must cover, *inter alia*, "any reparation award that may be issued by the Commission against the complainant *on any counterclaim by respondent*") (emphasis added); § 18(d) (*"any person* for whose benefit [a reparation award] was made" may enforce the judgment in district court) (emphasis added). See also § 18(e) (judicial review available to "any party"). Accordingly, the court below did not seriously contest that Congress intended to authorize the CFTC to adjudicate *some* counterclaims in reparations proceedings. Rather, the court read into the facially unqualified reference to counterclaim jurisdiction a distinction between counterclaims arising under the Act or CFTC regulations and all other counterclaims. See 239 U. S. App. D. C., at 173, 740 F. 2d, at 1278. While the court's reading permitted it to avoid a potential Article III problem, it did so only by doing violence to the CEA, for its distinction cannot fairly be drawn from the language or history of the CEA, nor reconciled with the congressional purposes motivating the creation of the reparations proceedings.

We can find no basis in the language of the statute or its legislative history for the distinction posited by the Court of Appeals. Congress empowered the CFTC "to make and promulgate such rules and regulations as, in the judgment of the Commission, are reasonably necessary *to effectuate any of the provisions or to accomplish any of the purposes of* [the CEA]." 7 U. S. C. § 12a(5) (emphasis added). The language of the congressional Report that specifically commented on the scope of the CFTC's authority over counterclaims unambiguously demonstrates that, consistent with the sweeping authority Congress delegated to the CFTC generally, Congress intended to vest in the CFTC the power to define the scope of the counterclaims cognizable in reparations proceedings:

> "Counterclaims will be recognized in the [reparations] proceedings . . . on such terms and under such circumstances as the Commission may prescribe by regulation. It is the intent of the Committee that the Commission will promulgate appropriate regulations to implement this section." H. R. Rep. No. 93–975, p. 23 (1974).

Moreover, quite apart from congressional statements of intent, the broad grant of power in § 12a(5) clearly authorizes the promulgation of regulations providing for adjudication of common law counterclaims arising out of the same transaction as a reparations complaint because such jurisdiction is necessary, if not critical, to accomplish the purposes behind the reparations program.

Reference to the instant controversy illustrates the crippling effect that the Court of Appeals' restrictive reading of the CFTC's counterclaim jurisdiction would have on the efficacy of the reparations remedy. The dispute between Schor and Conti is typical of the disputes adjudicated in reparations proceedings: a customer and a professional commodities broker agree that there is a debit balance in the customer's account, but the customer attributes the deficit to the broker's alleged CEA violations and the broker attributes it to the customer's lack of success in the market. The customer brings a reparations claim; the broker counterclaims for the amount of the debit balance. In the usual case, then, the counterclaim "arises out of precisely the same course of events" as the principal claim and requires resolution of many of the same disputed factual issues. *Friedman* v. *Dean Witter & Co.*, [1980–1982 Transfer Binder] CCH Comm. Fut. L. Rep. ¶ 21,307, p. 25,538 (1981).

Under the Court of Appeals' approach, the entire dispute may not be resolved in the administrative forum. Consequently, the entire dispute will typically end up in court, for when the broker files suit to recover the debit balance, the customer will normally be compelled either by compulsory counterclaim rules or by the expense and inconvenience of

litigating the same issues in two fora to forgo his reparations remedy and to litigate his claim in court. See, *e. g.*, App. 13 (Schor's motion to dismiss Conti's federal court action) ("[C]ontinuation of this action, in light of the prior filed reparations proceedings, would be unjust to [Schor] in that it would require [him], at a great cost and expense, to litigate the same issues in two forums. If this action proceeds, defendants will be required pursuant to [Federal Rule of Civil Procedure 13(a)] to file a counterclaim in this action setting forth all the claims that they have already filed before the CFTC"). In sum, as Schor himself aptly summarized, to require a bifurcated examination of the single dispute "would be to emasculate if not destroy the purposes of the Commodity Exchange Act to provide an efficient and relatively inexpensive forum for the resolution of disputes in futures trading." *Ibid.* See also App. to Pet. for Cert. in No. 85–621, p. 71a (Wald, J., dissenting from denial of rehearing) ("To bifurcate, as the panel's decision now requires, the main reparations proceeding from counterclaims between the same parties . . . will realistically mean that the *courts*, not the agency, will end up dealing with *all* of these claims. The faster and less expensive alternative forum will be decimated").

As our discussion makes manifest, the CFTC's long-held position that it has the power to take jurisdiction over counterclaims such as Conti's is eminently reasonable and well within the scope of its delegated authority. Accordingly, as the CFTC's contemporaneous interpretation of the statute it is entrusted to administer, considerable weight must be accorded the CFTC's position. See *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837, 844–845 (1984); *Red Lion Broadcasting Co., Inc.* v. *FCC*, 395 U. S. 367, 380–381 (1969). The Court of Appeals declined to defer to the CFTC's interpretation because, in its view, the Commission had not maintained a consistent position on the scope of its authority to adjudicate counterclaims and the

question was not one on which a specialized administrative agency, in contrast to a court of general jurisdiction, had superior expertise. 239 U. S. App. D. C., at 176, 740 F. 2d, at 1279. We find both these reasons insubstantial.

First, the CFTC issued the counterclaim rule currently in force at the time that the reparations program first took effect and has never altered that rule. The only "inconsistency" identified by the Court of Appeals was a *proposed* rule, published by the Commission for notice and comment, that would have allowed a narrower class of counterclaims. 40 Fed. Reg. 55666–55667, 55672–55673 (1975). It goes without saying that a proposed regulation does not represent an agency's considered interpretation of its statute and that an agency is entitled to consider alternative interpretations before settling on the view it considers most sound. Indeed, it would be antithetical to the purposes of the notice and comment provisions of the Administrative Procedure Act, 5 U. S. C. § 553, to tax an agency with "inconsistency" whenever it circulates a proposal that it has not firmly decided to put into effect and that it subsequently reconsiders in response to public comment.

Second, the Court of Appeals was incorrect to state on the facts of this case that the CFTC's expertise was not deserving of deference because of the "statutory interpretation-jurisdictional" nature of the question at issue. 239 U. S. App. D. C., at 176, 740 F. 2d, at 1279. An agency's expertise is superior to that of a court when a dispute centers on whether a particular regulation is "reasonably necessary to effectuate any of the provisions or to accomplish any of the purposes" of the Act the agency is charged with enforcing; the agency's position, in such circumstances, is therefore due substantial deference.

Such deference is especially warranted here, for Congress has twice amended the CEA since the CFTC declared by regulation that it would exercise jurisdiction over counterclaims arising out of the same transaction as the principal

reparations dispute but has not overruled the CFTC's assertion of jurisdiction. See *Red Lion Broadcasting Co., Inc.* v. *FCC, supra,* at 380–381. It is well established that when Congress revisits a statute giving rise to a longstanding administrative interpretation without pertinent change, the "congressional failure to revise or repeal the agency's interpretation is persuasive evidence that the interpretation is the one intended by Congress." *NLRB* v. *Bell Aerospace Co.,* 416 U. S. 267, 274–275 (1974) (footnotes omitted). See also *FDIC* v. *Philadelphia Gear Corp.,* 476 U. S. 426 (1986).

Moreover, we need not, as the Court of Appeals argued, rely simply on congressional "silence" to find approval of the CFTC's position in the subsequent amendments to the CEA, see 239 U. S. App. D. C., at 177, 740 F. 2d, at 1280. Congress explicitly affirmed the CFTC's authority to dictate the scope of its counterclaim jurisdiction in the 1983 amendments to the Act:

> "The Commission may promulgate such rules, regulations, and orders as it deems necessary or appropriate for the efficient and expeditious administration of this section. Notwithstanding any other provision of law, such rules, regulations, and orders may prescribe, or otherwise condition, without limitation, . . . the nature and scope of . . . counterclaims, . . . and all other matters governing proceedings before the Commission under this section." 7 U. S. C. § 18(b).

See also H. R. Rep. No. 97–565, pt. 1, p. 55 (1982) ("[T]he reparations program seeks to pass upon the whole controversy surrounding each claim, including counter-claims arising out of the same set of facts"). Where, as here, "Congress has not just kept its silence by refusing to overturn the administrative construction, but has ratified it with positive legislation," we cannot but deem that construction virtually conclusive. See *Red Lion Broadcasting Co., Inc.* v. *FCC, supra,* at 380–381. See also *Bell* v. *New Jersey,* 461 U. S. 773, 785, and n. 12 (1983).

In view of the abundant evidence that Congress both contemplated and authorized the CFTC's assertion of jurisdiction over Conti's common law counterclaim, we conclude that the Court of Appeals' analysis is untenable. The canon of construction that requires courts to avoid unnecessary constitutional adjudication did not empower the Court of Appeals to manufacture a restriction on the CFTC's jurisdiction that was nowhere contemplated by Congress and to reject plain evidence of congressional intent because that intent was not specifically embodied in a statutory mandate. See *Heckler* v. *Mathews*, 465 U. S., at 742–743. We therefore are squarely faced with the question whether the CFTC's assumption of jurisdiction over common law counterclaims violates Article III of the Constitution.

## III

Article III, § 1, directs that the "judicial Power of the United States shall be vested in one supreme Court and in such inferior Courts as the Congress may from time to time ordain and establish," and provides that these federal courts shall be staffed by judges who hold office during good behavior, and whose compensation shall not be diminished during tenure in office. Schor claims that these provisions prohibit Congress from authorizing the initial adjudication of common law counterclaims by the CFTC, an administrative agency whose adjudicatory officers do not enjoy the tenure and salary protections embodied in Article III.

Although our precedents in this area do not admit of easy synthesis, they do establish that the resolution of claims such as Schor's cannot turn on conclusory reference to the language of Article III. See, *e. g.*, *Thomas*, 473 U. S., at 583. Rather, the constitutionality of a given congressional delegation of adjudicative functions to a non-Article III body must be assessed by reference to the purposes underlying the requirements of Article III. See, *e. g.*, *id.*, at 590; *Northern Pipeline*, 458 U. S., at 64. This inquiry, in turn, is guided

by the principle that "practical attention to substance rather than doctrinaire reliance on formal categories should inform application of Article III." *Thomas, supra,* at 587. See also *Crowell* v. *Benson,* 285 U. S., at 53.

## A

Article III, § 1, serves both to protect "the role of the independent judiciary within the constitutional scheme of tripartite government," *Thomas, supra,* at 583, and to safeguard litigants' "right to have claims decided before judges who are free from potential domination by other branches of government." *United States* v. *Will,* 449 U. S. 200, 218 (1980). See also *Thomas, supra,* at 582–583; *Northern Pipeline,* 458 U. S., at 58. Although our cases have provided us with little occasion to discuss the nature or significance of this latter safeguard, our prior discussions of Article III, § 1's guarantee of an independent and impartial adjudication by the federal judiciary of matters within the judicial power of the United States intimated that this guarantee serves to protect primarily personal, rather than structural, interests. See, *e. g., id.,* at 90 (REHNQUIST, J., concurring in judgment) (noting lack of consent to non-Article III jurisdiction); *id.,* at 95 (WHITE, J., dissenting) (same). See also Currie, Bankruptcy Judges and the Independent Judiciary, 16 Creighton L. Rev. 441, 460, n. 108 (1983) (Article III, § 1, "was designed as a protection for the parties from the risk of legislative or executive pressure on judicial decision"). Cf. *Crowell* v. *Benson, supra,* at 87 (Brandeis, J., dissenting).

Our precedents also demonstrate, however, that Article III does not confer on litigants an absolute right to the plenary consideration of every nature of claim by an Article III court. See, *e. g., Thomas, supra,* at 583; *Crowell* v. *Benson, supra.* Moreover, as a personal right, Article III's guarantee of an impartial and independent federal adjudication is subject to waiver, just as are other personal constitutional rights that dictate the procedures by which civil

and criminal matters must be tried. See, *e. g., Boykin* v. *Alabama,* 395 U. S. 238 (1969) (waiver of criminal trial by guilty plea); *Duncan* v. *Louisiana,* 391 U. S. 145, 158 (1968) (waiver of right to trial by jury in criminal case); Fed. Rule of Civ. Proc. 38(d) (waiver of right to trial by jury in civil cases). Indeed, the relevance of concepts of waiver to Article III challenges is demonstrated by our decision in *Northern Pipeline,* in which the absence of consent to an initial adjudication before a non-Article III tribunal was relied on as a significant factor in determining that Article III forbade such adjudication. See, *e. g.,* 458 U. S., at 80, n. 31; *id.,* at 91 (REHNQUIST, J., concurring in judgment); *id.,* at 95 (WHITE, J., dissenting). See also *Thomas, supra,* at 584, 591. Cf. *Kimberly* v. *Arms,* 129 U. S. 512 (1889); *Heckers* v. *Fowler,* 2 Wall. 123 (1865).

In the instant cases, Schor indisputably waived any right he may have possessed to the full trial of Conti's counterclaim before an Article III court. Schor expressly demanded that Conti proceed on its counterclaim in the reparations proceeding rather than before the District Court, see App. 13, 19, and was content to have the entire dispute settled in the forum he had selected until the ALJ ruled against him on all counts; it was only after the ALJ rendered a decision to which he objected that Schor raised any challenge to the CFTC's consideration of Conti's counterclaim.

Even were there no evidence of an express waiver here, Schor's election to forgo his right to proceed in state or federal court on his claim and his decision to seek relief instead in a CFTC reparations proceeding constituted an effective waiver. Three years before Schor instituted his reparations action, a private right of action under the CEA was explicitly recognized in the Circuit in which Schor and Conti filed suit in District Court. See *Hirk* v. *Agri-Research Council, Inc.,* 561 F. 2d 96, 103, n. 8 (CA7 1977). See also *Merrill Lynch, Pierce, Fenner & Smith, Inc.* v. *Curran,* 456 U. S. 353 (1982) (affirming the existence of a private cause of action under the

CEA). Moreover, at the time Schor decided to seek relief before the CFTC rather than in the federal courts, the CFTC's regulations made clear that it was empowered to adjudicate all counterclaims "aris[ing] out of the same transaction or occurrence or series of transactions or occurrences set forth in the complaint." 41 Fed. Reg. 3995 (1976) (codified in 17 CFR § 12.23(b)(2) (1983)). Thus, Schor had the option of having the common law counterclaim against him adjudicated in a federal Article III court, but, with full knowledge that the CFTC would exercise jurisdiction over that claim, chose to avail himself of the quicker and less expensive procedure Congress had provided him. In such circumstances, it is clear that Schor effectively agreed to an adjudication by the CFTC of the entire controversy by seeking relief in this alternative forum. Cf. *McElrath* v. *United States*, 102 U. S. 426, 440 (1880).

B

As noted above, our precedents establish that Article III, § 1, not only preserves to litigants their interest in an impartial and independent federal adjudication of claims within the judicial power of the United States, but also serves as "an inseparable element of the constitutional system of checks and balances." *Northern Pipeline, supra,* at 58. See also *United States* v. *Will, supra,* at 217. Article III, § 1, safeguards the role of the Judicial Branch in our tripartite system by barring congressional attempts "to transfer jurisdiction [to non-Article III tribunals] for the purpose of emasculating" constitutional courts, *National Insurance Co.* v. *Tidewater Co.,* 337 U. S. 582, 644 (1949) (Vinson, C. J., dissenting), and thereby preventing "the encroachment or aggrandizement of one branch at the expense of the other." *Buckley* v. *Valeo,* 424 U. S. 1, 122 (1976) *(per curiam).* See *Thomas,* 473 U. S., at 582–583; *Northern Pipeline,* 458 U. S., at 57–58, 73–74, 83, 86; *id.,* at 98, 115–116 (WHITE, J., dissenting). To the extent that this structural principle is

implicated in a given case, the parties cannot by consent cure the constitutional difficulty for the same reason that the parties by consent cannot confer on federal courts subject-matter jurisdiction beyond the limitations imposed by Article III, § 2. See, *e. g.*, *United States* v. *Griffin*, 303 U. S. 226, 229 (1938). When these Article III limitations are at issue, notions of consent and waiver cannot be dispositive because the limitations serve institutional interests that the parties cannot be expected to protect.

In determining the extent to which a given congressional decision to authorize the adjudication of Article III business in a non-Article III tribunal impermissibly threatens the institutional integrity of the Judicial Branch, the Court has declined to adopt formalistic and unbending rules. *Thomas*, 473 U. S., at 587. Although such rules might lend a greater degree of coherence to this area of the law, they might also unduly constrict Congress' ability to take needed and innovative action pursuant to its Article I powers. Thus, in reviewing Article III challenges, we have weighed a number of factors, none of which has been deemed determinative, with an eye to the practical effect that the congressional action will have on the constitutionally assigned role of the federal judiciary. *Id.*, at 590. Among the factors upon which we have focused are the extent to which the "essential attributes of judicial power" are reserved to Article III courts, and, conversely, the extent to which the non-Article III forum exercises the range of jurisdiction and powers normally vested only in Article III courts, the origins and importance of the right to be adjudicated, and the concerns that drove Congress to depart from the requirements of Article III. See, *e. g.*, *id.*, at 587, 589–593; *Northern Pipeline*, *supra*, at 84–86.

An examination of the relative allocation of powers between the CFTC and Article III courts in light of the considerations given prominence in our precedents demonstrates that the congressional scheme does not impermissibly intrude

on the province of the judiciary. The CFTC's adjudicatory powers depart from the traditional agency model in just one respect: the CFTC's jurisdiction over common law counterclaims. While wholesale importation of concepts of pendent or ancillary jurisdiction into the agency context may create greater constitutional difficulties, we decline to endorse an absolute prohibition on such jurisdiction out of fear of where some hypothetical "slippery slope" may deposit us. Indeed, the CFTC's exercise of this type of jurisdiction is not without precedent. Thus, in *RFC* v. *Bankers Trust Co.*, 318 U. S. 163, 168–171 (1943), we saw no constitutional difficulty in the initial adjudication of a state law claim by a federal agency, subject to judicial review, when that claim was ancillary to a federal law dispute. Similarly, in *Katchen* v. *Landy*, 382 U. S. 323 (1966), this Court upheld a bankruptcy referee's power to hear and decide state law counterclaims against a creditor who filed a claim in bankruptcy when those counterclaims arose out of the same transaction. We reasoned that, as a practical matter, requiring the trustee to commence a plenary action to recover on its counterclaim would be a "meaningless gesture." *Id.*, at 334.

In the instant cases, we are likewise persuaded that there is little practical reason to find that this single deviation from the agency model is fatal to the congressional scheme. Aside from its authorization of counterclaim jurisdiction, the CEA leaves far more of the "essential attributes of judicial power" to Article III courts than did that portion of the Bankruptcy Act found unconstitutional in *Northern Pipeline*. The CEA scheme in fact hews closely to the agency model approved by the Court in *Crowell* v. *Benson*, 285 U. S. 22 (1932).

The CFTC, like the agency in *Crowell*, deals only with a "particularized area of law," *Northern Pipeline, supra,* at 85, whereas the jurisdiction of the bankruptcy courts found unconstitutional in *Northern Pipeline* extended to broadly "all civil proceedings arising under title 11 or arising in or *related*

*to* cases under title 11." 28 U. S. C. § 1471(b) (quoted in *Northern Pipeline*, 458 U. S., at 85) (emphasis added). CFTC orders, like those of the agency in *Crowell*, but unlike those of the bankruptcy courts under the 1978 Act, are enforceable only by order of the district court. See 7 U. S. C. § 18(f); *Northern Pipeline, supra*, at 85–86. CFTC orders are also reviewed under the same "weight of the evidence" standard sustained in *Crowell*, rather than the more deferential standard found lacking in *Northern Pipeline*. See 7 U. S. C. § 9; *Northern Pipeline, supra*, at 85. The legal rulings of the CFTC, like the legal determinations of the agency in *Crowell*, are subject to *de novo* review. Finally, the CFTC, unlike the bankruptcy courts under the 1978 Act, does not exercise "all ordinary powers of district courts," and thus may not, for instance, preside over jury trials or issue writs of habeas corpus. 458 U. S., at 85.

Of course, the nature of the claim has significance in our Article III analysis quite apart from the method prescribed for its adjudication. The counterclaim asserted in this litigation is a "private" right for which state law provides the rule of decision. It is therefore a claim of the kind assumed to be at the "core" of matters normally reserved to Article III courts. See, *e. g., Thomas, supra*, at 587; *Northern Pipeline*, 458 U. S., at 70–71, and n. 25; *id.*, at 90 (REHNQUIST, J., concurring in judgment). Yet this conclusion does not end our inquiry; just as this Court has rejected any attempt to make determinative for Article III purposes the distinction between public rights and private rights, *Thomas, supra*, at 585–586, there is no reason inherent in separation of powers principles to accord the state law character of a claim talismanic power in Article III inquiries. See, *e. g., Northern Pipeline*, 458 U. S., at 68, n. 20; *id.*, at 98 (WHITE, J., dissenting).

We have explained that "the public rights doctrine reflects simply a pragmatic understanding that when Congress selects a quasi-judicial method of resolving matters that 'could

be conclusively determined by the Executive and Legislative Branches,' the danger of encroaching on the judicial powers" is less than when private rights, which are normally within the purview of the judiciary, are relegated as an initial matter to administrative adjudication. *Thomas*, 473 U. S., at 589 (quoting *Northern Pipeline, supra*, at 68). Similarly, the state law character of a claim is significant for purposes of determining the effect that an initial adjudication of those claims by a non-Article III tribunal will have on the separation of powers for the simple reason that private, common law rights were historically the types of matters subject to resolution by Article III courts. See *Northern Pipeline*, 458 U. S., at 68, n. 20, 84; *id.*, at 90 (REHNQUIST, J., concurring in judgment). The risk that Congress may improperly have encroached on the federal judiciary is obviously magnified when Congress "withdraw[s] from judicial cognizance any matter which, from its nature, is the subject of a suit at the common law, or in equity, or admiralty" and which therefore has traditionally been tried in Article III courts, and allocates the decision of those matters to a non-Article III forum of its own creation. *Murray's Lessee* v. *Hoboken Land & Improvement Co.*, 18 How. 272, 284 (1856). Accordingly, where private, common law rights are at stake, our examination of the congressional attempt to control the manner in which those rights are adjudicated has been searching. See, *e. g., Northern Pipeline*, 458 U. S., at 84; *id.*, at 90 (REHNQUIST, J., concurring in judgment). In this litigation, however, "[l]ooking beyond form to the substance of what" Congress has done, we are persuaded that the congressional authorization of limited CFTC jurisdiction over a narrow class of common law claims as an incident to the CFTC's primary, and unchallenged, adjudicative function does not create a substantial threat to the separation of powers. *Thomas, supra*, at 589.

It is clear that Congress has not attempted to "withdraw from judicial cognizance" the determination of Conti's right to

the sum represented by the debit balance in Schor's account. Congress gave the CFTC the authority to adjudicate such matters, but the decision to invoke this forum is left entirely to the parties and the power of the federal judiciary to take jurisdiction of these matters is unaffected.   In such circumstances, separation of powers concerns are diminished, for it seems self-evident that just as Congress may encourage parties to settle a dispute out of court or resort to arbitration without impermissible incursions on the separation of powers, Congress may make available a quasi-judicial mechanism through which willing parties may, at their option, elect to resolve their differences.   This is not to say, of course, that if Congress created a phalanx of non-Article III tribunals equipped to handle the entire business of the Article III courts without any Article III supervision or control and without evidence of valid and specific legislative necessities, the fact that the parties had the election to proceed in their forum of choice would necessarily save the scheme from constitutional attack.   See, *e. g., Northern Pipeline, supra,* at 73–74.   But this case obviously bears no resemblance to such a scenario, given the degree of judicial control saved to the federal courts, see *supra,* at 852–853, as well as the congressional purpose behind the jurisdictional delegation, the demonstrated need for the delegation, and the limited nature of the delegation.

When Congress authorized the CFTC to adjudicate counterclaims, its primary focus was on making effective a specific and limited federal regulatory scheme, not on allocating jurisdiction among federal tribunals.   Congress intended to create an inexpensive and expeditious alternative forum through which customers could enforce the provisions of the CEA against professional brokers.   Its decision to endow the CFTC with jurisdiction over such reparations claims is readily understandable given the perception that the CFTC was relatively immune from political pressures, see H. R. Rep. No. 93–975, pp. 44, 70 (1974), and the obvious exper-

tise that the Commission possesses in applying the CEA and its own regulations. This reparations scheme itself is of unquestioned constitutional validity. See, *e. g., Thomas, supra,* at 589; *Northern Pipeline, supra,* at 80–81; *Crowell* v. *Benson,* 285 U. S. 22 (1932). It was only to ensure the effectiveness of this scheme that Congress authorized the CFTC to assert jurisdiction over common law counterclaims. Indeed, as was explained above, absent the CFTC's exercise of that authority, the purposes of the reparations procedure would have been confounded.

It also bears emphasis that the CFTC's assertion of counterclaim jurisdiction is limited to that which is necessary to make the reparations procedure workable. See 7 U. S. C. § 12a(5). The CFTC adjudication of common law counterclaims is incidental to, and completely dependent upon, adjudication of reparations claims created by federal law, and in actual fact is limited to claims arising out of the same transaction or occurrence as the reparations claim.

In such circumstances, the magnitude of any intrusion on the Judicial Branch can only be termed *de minimis.* Conversely, were we to hold that the Legislative Branch may not permit such limited cognizance of common law counterclaims at the election of the parties, it is clear that we would "defeat the obvious purpose of the legislation to furnish a prompt, continuous, expert and inexpensive method for dealing with a class of questions of fact which are peculiarly suited to examination and determination by an administrative agency specially assigned to that task." *Crowell* v. *Benson, supra,* at 46. See also *Thomas, supra,* at 583–584. We do not think Article III compels this degree of prophylaxis.

Nor does our decision in *Bowsher* v. *Synar, ante,* p. 714, require a contrary result. Unlike *Bowsher,* this case raises no question of the aggrandizement of congressional power at the expense of a coordinate branch. Instead, the separation of powers question presented in this litigation is whether Congress impermissibly undermined, without appreciable ex-

pansion of its own power, the role of the Judicial Branch. In any case, we have, consistent with *Bowsher,* looked to a number of factors in evaluating the extent to which the congressional scheme endangers separation of powers principles under the circumstances presented, but have found no genuine threat to those principles to be present in this litigation.

In so doing, we have also been faithful to our Article III precedents, which counsel that bright-line rules cannot effectively be employed to yield broad principles applicable in all Article III inquiries. See, *e. g., Thomas,* 473 U. S. 568 (1985). Rather, due regard must be given in each case to the unique aspects of the congressional plan at issue and its practical consequences in light of the larger concerns that underlie Article III. We conclude that the limited jurisdiction that the CFTC asserts over state law claims as a necessary incident to the adjudication of federal claims willingly submitted by the parties for initial agency adjudication does not contravene separation of powers principles or Article III.

## C

Schor asserts that Article III, § 1, constrains Congress for reasons of federalism, as well as for reasons of separation of powers. He argues that the state law character of Conti's counterclaim transforms the central question in this litigation from whether Congress has trespassed upon the judicial powers of the Federal Government into whether Congress has invaded the prerogatives of state governments.

At the outset, we note that our prior precedents in this area have dealt only with separation of powers concerns, and have not intimated that principles of federalism impose limits on Congress' ability to delegate adjudicative functions to non-Article III tribunals. This absence of discussion regarding federalism is particularly telling in *Northern Pipeline,* where the Court based its analysis solely on the separation of powers principles inherent in Article III despite the fact that the claim sought to be adjudicated in the bankruptcy court was

created by state law. See, *e. g.*, 458 U. S., at 57–60, and n. 11.

Even assuming that principles of federalism are relevant to Article III analysis, however, we are unpersuaded that those principles require the invalidation of the CFTC's counterclaim jurisdiction. The sole fact that Conti's counterclaim is resolved by a *federal* rather than a *state* tribunal could not be said to unduly impair state interests, for it is established that a federal court could, without constitutional hazard, decide a counterclaim such as the one asserted here under its ancillary jurisdiction, even if an independent jurisdictional basis for it were lacking. See, *e. g., Baker* v. *Gold Seal Liquors,* 417 U. S. 467, 469, n. 1 (1974); *Moore* v. *New York Cotton Exchange,* 270 U. S. 593, 609 (1926). Given that the federal courts can and do exercise ancillary jurisdiction over counterclaims such as the one at issue here, the question becomes whether the fact that a federal agency rather than a federal Article III court initially hears the state law claim gives rise to a cognizably greater impairment of principles of federalism.

Schor argues that those Framers opposed to diversity jurisdiction in the federal courts acquiesced in its inclusion in Article III only because they were assured that the federal judiciary would be protected by the tenure and salary provisions of Article III. He concludes, in essence, that to protect this constitutional compact, Article III should be read to absolutely preclude any adjudication of state law claims by federal decisionmakers that do not enjoy the Article III salary and tenure protections. We are unpersuaded by Schor's novel theory, which suffers from a number of flaws, the most important of which is that Schor identifies no historical support for the critical link he posits between the provisions of Article III that protect the independence of the federal judiciary and those provisions that define the extent of the judiciary's jurisdiction over state law claims.

The judgment of the Court of Appeals for the District of Columbia Circuit is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE BRENNAN, with whom JUSTICE MARSHALL joins, dissenting.

Article III, § 1, of the Constitution provides that "[t]he judicial Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish." It further specifies that the federal judicial power must be exercised by judges who "shall hold their Offices during good Behaviour, and [who] shall, at stated Times, receive for their Services a Compensation, which shall not be diminished during their Continuance in Office."

On its face, Article III, § 1, seems to prohibit the vesting of *any* judicial functions in either the Legislative or the Executive Branch. The Court has, however, recognized three narrow exceptions to the otherwise absolute mandate of Article III: territorial courts, see, *e. g., American Ins. Co.* v. *Canter,* 1 Pet. 511 (1828); courts-martial, see, *e. g., Dynes* v. *Hoover,* 20 How. 65 (1857); and courts that adjudicate certain disputes concerning public rights, see, *e. g., Murray's Lessee* v. *Hoboken Land & Improvement Co.,* 18 How. 272 (1856); *Ex parte Bakelite Corp.,* 279 U. S. 438 (1929); *Crowell* v. *Benson,* 285 U. S. 22 (1932); *Thomas* v. *Union Carbide Agricultural Products Co.,* 473 U. S. 568 (1985). See generally *Northern Pipeline Construction Co.* v. *Marathon Pipe Line Co.,* 458 U. S. 50 (1982) (opinion of BRENNAN, J.). Unlike the Court, I would limit the judicial authority of non-Article III federal tribunals to these few, long-established exceptions and would countenance no further erosion of Article III's mandate.

I

The Framers knew that "[t]he accumulation of all powers, Legislative, Executive, and Judiciary, in the same hands,

whether of one, a few, or many, and whether hereditary, self-appointed, or elective, may justly be pronounced the very definition of tyranny." The Federalist No. 46, p. 334 (H. Dawson ed. 1876) (J. Madison). In order to prevent such tyranny, the Framers devised a governmental structure composed of three distinct branches — "a vigorous Legislative Branch," "a separate and wholly independent Executive Branch," and "a Judicial Branch equally independent." *Bowsher* v. *Synar, ante*, at 722. The separation of powers and the checks and balances that the Framers built into our tripartite form of government were intended to operate as a "self-executing safeguard against the encroachment or aggrandizement of one branch at the expense of the other." *Buckley* v. *Valeo*, 424 U. S. 1, 122 (1976) *(per curiam)*. "'The fundamental necessity of maintaining each of the three general departments of government entirely free from the control or coercive influence, direct or indirect, of either of the others, has often been stressed and is hardly open to serious question.'" *Bowsher, ante*, at 725 (quoting *Humphrey's Executor* v. *United States*, 295 U. S. 602, 629 (1935)). The federal judicial power, then, must be exercised by judges who are independent of the Executive and the Legislature in order to maintain the checks and balances that are crucial to our constitutional structure.

The Framers also understood that a principal benefit of the separation of the judicial power from the legislative and executive powers would be the protection of individual litigants from decisionmakers susceptible to majoritarian pressures. Article III's salary and tenure provisions promote impartial adjudication by placing the judicial power of the United States "in a body of judges insulated from majoritarian pressures and thus able to enforce [federal law] without fear of reprisal or public rebuke." *United States* v. *Raddatz*, 447 U. S. 667, 704 (1980) (MARSHALL, J., dissenting). As Alexander Hamilton observed, "[t]hat inflexible and uniform adherence to the rights of the Constitution, and of individ-

uals, which we perceive to be indispensable in the Courts of justice can certainly not be expected from Judges who hold their offices by a temporary commission." The Federalist No. 78, p. 546 (H. Dawson ed. 1876). This is so because

> "[i]f the power of making [periodic appointments] was committed either to the Executive or Legislature, there would. be danger of an improper complaisance to the branch which possessed it; if to both, there would be an unwillingness to hazard the displeasure of either; if to the People, or to persons chosen by them for the special purpose, there would be too great a disposition to consult popularity, to justify a reliance that nothing would be consulted but the Constitution and the laws." *Ibid.*

"Next to permanency in office," Hamilton added, "nothing can contribute more to the independence of the Judges than a fixed provision for their support" because *"a power over a man's subsistence amounts to a power over his will." Id.,* at 548 (emphasis in original). See also *United States* v. *Will,* 449 U. S. 200, 217–218 (1980) ("A Judiciary free from control by the Executive and the Legislature is essential if there is a right to have claims decided by judges who are free from potential domination by other branches of government"); *United States ex rel. Toth* v. *Quarles,* 350 U. S. 11, 16 (1955) (Black, J.) ("The provisions of Article III were designed to give judges maximum freedom from the possible coercion or influence by the executive or legislative branches of the Government").

These important functions of Article III are too central to our constitutional scheme to risk their incremental erosion. The exceptions we have recognized for territorial courts, courts-martial, and administrative courts were each based on "certain exceptional powers bestowed upon Congress by the Constitution or by historical consensus." *Northern Pipeline, supra,* at 70 (opinion of BRENNAN, J.). Here, however, there is no equally forceful reason to extend further these exceptions to situations that are distinguishable from

existing precedents. Cf. Currie, Bankruptcy Judges and the Independent Judiciary, 16 Creighton L. Rev. 441, 445 (1983). The Court, however, engages in just such an extension. By sanctioning the adjudication of state-law counterclaims by a federal administrative agency, the Court far exceeds the analytic framework of our precedents.

More than a century ago, we recognized that Congress may not "withdraw from [Article III] judicial cognizance any matter *which, from its nature, is the subject of a suit at the common law*, or in equity, or admiralty." *Murray's Lessee*, 18 How., at 284 (emphasis added). More recently, in *Northern Pipeline*, 458 U. S. 50 (1982), the view of a majority of the Court that the breach-of-contract and misrepresentation claims at issue in that case lay "at the core of the historically recognized judicial power," *id.*, at 70 (opinion of BRENNAN, J.), and were "the stuff of the traditional actions at common law tried by the courts at Westminster in 1789," *id.*, at 90 (opinion of REHNQUIST, J.), contributed significantly to the Court's conclusion that the bankruptcy courts could not constitutionally adjudicate Northern Pipeline's common-law claims. In the instant litigation, the Court lightly discards both history and our precedents. The Court attempts to support the substantial alteration it works today in our Article III jurisprudence by pointing, *inter alia*, to legislative convenience; to the fact that Congress does not altogether eliminate federal-court jurisdiction over ancillary state-law counterclaims; and to Schor's "consent" to CFTC adjudication of ContiCommodity's counterclaims.* In my view, the Court's effort fails.

---

*The Court also rests its holding on the fact that Congress has not assigned the same sweeping judicial powers to the CFTC that it had assigned to the bankruptcy courts under the Bankruptcy Act of 1978 and that we held violated Article III in *Northern Pipeline Construction Co.* v. *Marathon Pipe Line Co.*, 458 U. S. 50 (1982). While I agree with the Court that the grant of judicial authority to the CFTC is significantly narrower in scope than the grant to the bankruptcy courts under the 1978 Act, in my view, that difference does not suffice to cure the constitutional defects raised by the grant of authority over state-law counterclaims to the CFTC.

## II

The Court states that in reviewing Article III challenges, one of several factors we have taken into account is "the concerns that drove Congress to depart from the requirements of Article III." *Ante*, at 851. The Court identifies the desire of Congress "to create an inexpensive and expeditious alternative forum through which customers could enforce the provisions of the CEA against professional brokers" as the motivating congressional concern here. *Ante*, at 855. The Court further states that "[i]t was only to ensure the effectiveness of this scheme that Congress authorized the CFTC to assert jurisdiction over common-law counterclaims[;] . . . absent the CFTC's exercise of that authority, the purposes of the reparations procedure would have been confounded." *Ante*, at 856. Were we to hold that the CFTC's authority to decide common-law counterclaims offends Article III, the Court declares, "it is clear that we would 'defeat the obvious purpose of the legislation.'" *Ibid.* Article III, the Court concludes, does not "compe[l] this degree of prophylaxis." *Ibid.*

I disagree—Article III's prophylactic protections were intended to prevent just this sort of abdication to claims of legislative convenience. The Court requires that the legislative interest in convenience and efficiency be weighed against the competing interest in judicial independence. In doing so, the Court pits an interest the benefits of which are immediate, concrete, and easily understood against one, the benefits of which are almost entirely prophylactic, and thus often seem remote and not worth the cost in any single case. Thus, while this balancing creates the illusion of objectivity and ineluctability, in fact the result was foreordained, because the balance is weighted against judicial independence. See Redish, Legislative Courts, Administrative Agencies, and the *Northern Pipeline* Decision, 1983 Duke L. J. 197, 221–222. The danger of the Court's balancing approach is, of course, that as individual cases accumulate in which the

Court finds that the short-term benefits of efficiency outweigh the long-term benefits of judicial independence, the protections of Article III will be eviscerated.

Perhaps the resolution of reparations claims such as respondents' may be accomplished more conveniently under the Court's decision than under my approach, but the Framers foreswore this sort of convenience in order to preserve freedom. As we explained in *INS* v. *Chadha*, 462 U. S. 919, 959 (1983):

> "The choices we discern as having been made in the Constitutional Convention impose burdens on governmental processes that often seem clumsy, inefficient, even unworkable, but those hard choices were consciously made by men who had lived under a form of government that permitted arbitrary governmental acts to go unchecked. . . . With all the obvious flaws of delay [and] untidiness . . . , we have not yet found a better way to preserve freedom than by making the exercise of power subject to the carefully crafted restraints spelled out in the Constitution."

Moreover, in *Bowsher* v. *Synar, ante,* p. 714, we rejected the appellant's argument that legislative convenience saved the constitutionality of the assignment by Congress to the Comptroller General of essentially executive functions, stating: " '[T]he fact that a given law or procedure is efficient, convenient, and useful in facilitating functions of government, standing alone, will not save it if it is contrary to the Constitution. Convenience and efficiency are not the primary objectives—or the hallmarks—of democratic government . . . .'" *Ante,* at 736 (quoting *Chadha, supra,* at 944). We recognized that " '[t]he hydraulic pressure inherent within each of the separate Branches to exceed the outer limits of its power, even to accomplish desirable objectives, must be resisted.'" *Ante,* at 727 (quoting *Chadha, supra,* at 951). Despite the "conflicts, confusion, and discordance" that separation of powers may at times generate, *ante,* at

722, we held that it is necessary to endure the inconvenience of separated powers in order " 'to secure liberty.' " *Ante,* at 721 (quoting *Youngstown Sheet & Tube Co.* v. *Sawyer,* 343 U. S. 579, 635 (1952) (Jackson, J., concurring)).

It is impossible to reconcile the radically different approaches the Court takes to separation of powers in this litigation and in *Bowsher.* The Framers established *three* coequal branches of government and intended to preserve *each* from encroachment by either of the others. The Constitution did not grant Congress the general authority to bypass the Judiciary whenever Congress deems it advisable, any more than it granted Congress the authority to arrogate to itself executive functions.

## III

According to the Court, the intrusion into the province of the Federal Judiciary caused by the CFTC's authority to adjudicate state-law counterclaims is insignificant, both because the CFTC *shares* in, rather than displaces, federal district court jurisdiction over these claims and because only a very narrow class of state-law issues are involved. The "sharing" justification fails under the reasoning used by the Court to support the CFTC's authority. If the administrative reparations proceeding is so much more convenient and efficient than litigation in federal district court that abrogation of Article III's commands is warranted, it seems to me that complainants would rarely, if ever, choose to go to district court in the first instance. Thus, any "sharing" of jurisdiction is more illusory than real.

More importantly, the Court, in emphasizing that *this litigation* will permit solely a narrow class of state-law claims to be decided by a non-Article III court, ignores the fact that it establishes a broad principle. The decision today may authorize the administrative adjudication only of state-law claims that stem from the same transaction or set of facts that allow the customer of a professional commodity broker to initiate reparations proceedings before the CFTC, but the

*reasoning* of this decision strongly suggests that, given "legislative necessity" and party consent, any federal agency may decide state-law issues that are ancillary to federal issues within the agency's jurisdiction. Thus, while in this litigation "the magnitude of any intrusion on the Judicial Branch" may conceivably be characterized as *"de minimis," ante,* at 856, the potential impact of the Court's decision on federal-court jurisdiction is substantial. The Court dismisses warnings about the dangers of its approach, asserting simply that it does not fear the slippery slope, *ante,* at 852, and that this litigation does not involve the creation by Congress of a "phalanx of non-Article III tribunals equipped to handle the entire business of the Article III courts." *Ante,* at 855. A healthy respect for the precipice on which we stand is warranted, however, for this reason: Congress can seriously impair Article III's structural and individual protections without assigning away "the *entire* business of the Article III courts." *Ibid.* (emphasis added). It can do so by *diluting* the judicial power of the federal courts. And, contrary to the Court's intimations, dilution of judicial power operates to impair the protections of Article III regardless of whether Congress acted with the "good intention" of providing a more efficient dispute resolution system or with the "bad intention" of strengthening the Legislative Branch at the expense of the Judiciary.

## IV

The Court's reliance on Schor's "consent" to a non-Article III tribunal is also misplaced. The Court erroneously suggests that there is a clear division between the separation of powers and the impartial adjudication functions of Article III. *Ante,* at 848. The Court identifies Article III's structural, or separation-of-powers, function as preservation of the Judiciary's domain from encroachment by another branch. *Ante,* at 850. The Court identifies the impartial adjudication function as the protection afforded by Article III to individ-

ual litigants against judges who may be dominated by other branches of government. *Ante*, at 848.

In my view, the structural and individual interests served by Article III are inseparable. The potential exists for individual litigants to be deprived of impartial decisionmakers only where federal officials who exercise judicial power are susceptible to congressional and executive pressure. That is, individual litigants may be harmed by the assignment of judicial power to non-Article III federal tribunals only where the Legislative or Executive Branches have encroached upon judicial authority and have thus threatened the separation of powers. The Court correctly recognizes that to the extent that Article III's structural concerns are implicated by a grant of judicial power to a non-Article III tribunal, "the parties cannot by consent cure the constitutional difficulty for the same reason that the parties by consent cannot confer on federal courts subject-matter jurisdiction beyond the limitations imposed by Article III, § 2." *Ante*, at 851. Because the individual and structural interests served by Article III are coextensive, I do not believe that a litigant may ever waive his right to an Article III tribunal where one is constitutionally required. In other words, consent is irrelevant to Article III analysis.

## V

Our Constitution unambiguously enunciates a fundamental principle—that the "judicial Power of the United States" be reposed in an independent Judiciary. It is our obligation zealously to guard that independence so that our tripartite system of government remains strong and that individuals continue to be protected against decisionmakers subject to majoritarian pressures. Unfortunately, today the Court forsakes that obligation for expediency. I dissent.