LAUGHLIN E. WATERS, Senior District Judge:
This appeal arises from an action filed in a Chapter 7 bankruptcy case by the trustee to avoid, pursuant to 11 U.S.C. § 544(b), an alleged fraudulent conveyance made by the Chapter 7 debtor, Roxanne Mankin (“Man-kin”). Named as the defendant in the trustee’s action is G.B. Munn (“Munn”), the party to whom Mankin made the alleged fraudulent transfer. Two issues have been raised on appeal: (1) whether the trustee’s action is a “core proceeding” which Congress intended bankruptcy courts to “hear and determine” pursuant to 28 U.S.C. § 157(b) and, if so, (2) whether exercise of jurisdiction by the bankruptcy court is unconstitutional under the holding of the Supreme Court in Northern Pipeline Construction Co. v. Marathon Pipe Line Co., 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982).
28 U.S.C. § 157(a) provides that district courts may refer “cases under title 11 or arising in or related to a case under title 11” to bankruptcy judges. Of the cases referred to them pursuant to 157(a), bankruptcy judges are authorized to “hear and determine” “cases under title 11” and “core proceedings” arising under Title 11. 28 U.S.C.A. § 157(b) (West Supp.1987). The “cases under title 11” and “core proceedings” heard and determined by bankruptcy judges pursuant to § 157(a) and (b) are subject to review by a district court “in the same manner as appeals in civil proceedings generally are taken to the courts of appeals from the district courts.” 28 U.S.C.A. § 158(c) (West Supp.1987). Non-core proceedings related to cases under Title 11 may also be referred to bankruptcy judges pursuant to 28 U.S.C. § 157(a). However, unless the parties stipulate otherwise, bankruptcy judges are authorized only to “hear” non-core proceedings referred to them and then submit proposed findings of fact and conclusions of law to the district court for de novo review. 28 U.S.C.A. § 157(c)(1) (West Supp.1987).
Congress has determined that proceedings to determine, avoid or recover fraudulent conveyances are “core proceedings” which may be referred to bankruptcy judges for determination pursuant to 28 U.S.C. § 157(b). 28 U.S.C.A. § 157(b)(2)(H) (West Supp.1987). There are two separate provisions in Title 11 which authorize a bankruptcy trustee to avoid conveyances: 11 U.S.C. § 544(b) and 11 U.S.C. § 548. Section 548 specifically authorizes the trustee to avoid any transfer of an interest of the debtor that was “made or incurred on or within one year before the date of the filing of the [bankruptcy] petition” if the debtor “made such transfer ... with actual intent to hinder, delay or defraud [any creditor].” 11 U.S.C.A. § 548(a)(1) (West 1979 & Supp.1987). Section 544(b) gives to the trustee the power to avoid any conveyances which an unsecured creditor could have avoided under applicable state law. See 11 U.S.C.A. § 544(b) (West 1979 & Supp.1987). Under California law, unsecured creditors are entitled to set aside fraudulent conveyances made by insolvent debtors. See Cal.Civ.Code §§ 3439-3439.11 (West Supp.1987).
*1299 In the present suit, the trustee seeks relief under § 544(b).[1] According to the trustee’s complaint, the debtor entered into a written assignment agreement with Munn in which she agreed to transfer to Munn her right to receive profits as a general partner in Capitola Investors, a limited partnership, in exchange for Munn’s promise to co-sign and guarantee a loan needed to refinance real property owned by Capitola. The trustee alleges that the transaction was fraudulent in that Munn’s promise to co-sign the loan was not fair consideration, the assignment was made while the debtor was insolvent or rendered her insolvent and the assignment was made with intent to hinder, delay or defraud creditors.
The trustee filed his § 544(b) action in the United States Bankruptcy Court for the Northern District of California on February 1, 1985. Munn responded to the complaint by filing a motion to dismiss. In this motion, Munn asserted the same position which he asserts on this appeal: that under the holding of the United States Supreme Court in Northern Pipeline Construction Co. v. Marathon Pipe Line Co., 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982), adjudication by the bankruptcy court of the trustee’s action violates Article III of the Constitution. The bankruptcy court accepted this position and by written order granted Munn’s motion to dismiss. This order was filed on May 22, 1985 and entered on May 27, 1985. The trustee then filed a motion for reconsideration which the bankruptcy court denied on July 25, 1985. On August 5, 1985, the trustee filed and served a notice of appeal to the district court from the bankruptcy court’s order dismissing the complaint.
In ruling on the trustee’s appeal, the district court found that the trustee’s action was a “core proceeding” as defined in 28 U.S.C. § 157(b)(2)(H) over which the bankruptcy court had jurisdiction pursuant to 28 U.S.C. § 157(b)(1). The district court also found that the Supreme Court’s holding in Northern Pipeline did not preclude the bankruptcy court’s jurisdiction “because the right of action arises under Title 11.” Accordingly, the district court reversed the order of dismissal and remanded the case to the bankruptcy court with instructions to the bankruptcy court to exercise jurisdiction.
The district court’s written order was entered on February 14, 1986. Munn noticed an appeal from this order to this court on March 12, 1986. Although the district court’s order authorizes further proceedings, we have jurisdiction under 28 U.S.C. § 158(d) to hear the appeal from the district court’s order because the bankruptcy court order appealed from was final. In re Sambo’s Restaurants, 754 F.2d 811, 813-815 (9th Cir.1985).
I. Statutory Jurisdiction of the Bankruptcy Court
28 U.S.C. § 157(b)(1) provides for bankruptcy court jurisdiction over core proceedings and 28 U.S.C. § 157(b)(2) lists various types of proceedings deemed by Congress to be core proceedings. Clause (H) of § 157(b)(2) provides that core proceedings include “proceedings to determine, avoid, or recover fraudulent conveyances....” 28 U.S.C.A. § 157(b)(2)(H) (West Supp.1987). A proceeding under 11 U.S.C. § 548, which specifically authorizes a trustee to set aside fraudulent conveyances made within one year of the filing of a bankruptcy petition, is unquestionably the type of proceeding referred to in § 157(b)(2)(H). Whether § 157(b)(2)(H) re *1300 fers to state fraudulent conveyance actions is, perhaps, somewhat less clear. The right of a trustee to bring state fraudulent conveyance actions is not specifically mentioned in the federal bankruptcy statutes but rather arises from 11 U.S.C. § 544(b), which allows the trustee to set aside a conveyance which an unsecured creditor could have set aside under state law. Munn argues that in order to avoid the constitutional question raised by allowing § 157(b)(2) bankruptcy jurisdiction over state fraudulent conveyance actions, we should construe § 157(b)(2)(H) as referring only to the federal fraudulent conveyance action codified in 11 U.S.C. § 548.
We decline to adopt the construction of § 157(b)(2)(H) suggested by Munn. It is true that “[fjederal statutes are to be so construed as to avoid serious doubt of their constitutionality.” International Ass’n. of Machinists v. Street, 367 U.S. 740, 749, 81 S.Ct. 1784, 1790, 6 L.Ed.2d 1141 (1961). By the same token however, “this canon of construction does not give a court the prerogative to ignore the legislative will in order to avoid constitutional adjudication.” Commodity Futures Trading Comm’n. v. Schor, — U.S.-, 106 S.Ct. 3245, 3252, 92 L.Ed.2d 675 (1986). To construe § 157(b)(2)(H) as being limited to proceedings pursuant to § 548 would be to “ignore the legislative will” underlying the statute. Not only is there nothing in the language of § 157(b)(2)(H) to support Munn’s argument, examination of § 157(b)(2)(H)’s context within the Bankruptcy Code, as well as its wording and legislative history, demonstrates that Congress never intended it to be given the restrictive reading that Munn urges.
Section 157(b)(2) does not set categorical limits on the jurisdiction of bankruptcy courts over core proceedings, but rather merely enumerates examples of proceedings falling within a bankruptcy court’s core proceeding jurisdiction. That Congress did not intend to limit the bankruptcy courts’ jurisdiction over core proceedings by enumerating examples of core proceedings in § 157(b)(2) is apparent from the prefatory language of § 157(b)(2): “Core matters include, but are not limited to_” (emphasis added). 28 U.S.C.A. § 157(b)(2) (West Supp.1987). Thus, in construing a bankruptcy court’s jurisdiction over a particular action pursuant to § 157(b)(1), the crucial consideration is not whether the action falls within one of the clauses of § 157(b)(2), but rather whether the action is or is not in fact a core proceeding. As explained later in this opinion, an action by a trustee pursuant to § 544(b) to set aside a fraudulent conveyance is in fact a core proceeding. See infra at p. 1307.
Even if the bankruptcy court’s § 157(b) jurisdiction over this case did turn on construction of § 157(b)(2)(H), we have found no evidence that Congress intended to restrict § 157(b)(2)(H) to federal fraudulent conveyance proceedings. Not only does § 157(b)(2)(H) not distinguish between state and federal fraudulent conveyance proceedings, the federal law of fraudulent conveyance is essentially identical to the law of fraudulent conveyance adopted by the states.[2] Thus, for purposes of § 157(b)(2)(H), state fraudulent conveyance proceedings are distinguishable from federal fraudulent conveyance proceedings only by the fact that they are of state origin. Congress has explicitly found that this is a distinction which, standing alone, cannot serve as the basis for distinguishing core from non-core proceedings: “A determination that a proceeding is not a core proceed *1301 ing shall not be made solely on the basis that its resolution may be affected by State law.” 28 U.S.C.A. § 157(b)(3) (West Supp. 1987). In essence then the explicit provisions of the bankruptcy statutes are contrary to the judicial gloss Munn asks us to place on § 157(b)(2)(H).
Finally, we note that Munn’s position would contradict the understanding with which Congress enacted § 157(b). As Representative Kastenmeier explained, “the conference report largely rejects the Senate limitations on the tasks which are to be performed by a bankruptcy judge. The report states that a narrow category of cases are [sic] not to be construed as core proceedings.” 130 Cong.Rec. H7492 (daily ed. June 29, 1984). Nothing in the legislative history of § 157(b) suggests that Congress enumerated examples of core proceedings in § 157(b)(2) with anything but a view toward expanding the bankruptcy court’s jurisdiction to its constitutional limit. See generally 9 Bankruptcy Service ch. 81:6-8 (Supp.1987) (legislative history of the Bankruptcy Amendments and Federal Judgeship Act of 1984); see also In re Arnold Print Works, Inc., 815 F.2d 165, 168 (1st Cir.1987) (sponsors of 1984 Act “used arguments strongly suggesting that they were pressing the notion [of core proceedings] to its constitutional bounds”). It is inappropriate therefore to construe one of those examples restrictively in order to avoid a test of what the constitutional limit is.[3]
II. Constitutionality of Bankruptcy Court’s Jurisdiction
Article III of the Constitution provides that judges of courts vested with the “judicial Power of the United States” “shall hold their Offices during good Behavior, and shall, at stated Times, receive for their Services a Compensation, which shall not be diminished during their Continuance in Office.” U.S. Const, art. Ill, § 1. If the requirements of Article III were strictly applied to all cases involving the exercise of federal judicial power, resolution of the constitutional issue in this case would be simple: because the judges of the bankruptcy courts are not guaranteed either lifetime tenure or protection against salary reduction, see 28 U.S.C.A. §§ 152(a)(1), (e), 153(a) (West Supp.1987), their determination of this case would violate Article III. In actuality however resolution of the constitutional issue in this case is not so simple because there have been several instances in which the exercise of federal judicial power by judges without lifetime tenure or protection against salary reduction has been upheld by the Supreme Court under Article III. The trustee argues that this is an instance when a non-Article III officer may exercise federal judicial power. Munn of course argues the contrary.
A. Northern Pipeline and the Subsequent Enactment of the Bankruptcy Amendments and Federal Judgeship Act of 1984
The question of what bankruptcy proceedings can and cannot be committed to the jurisdiction of a non-Article III bankruptcy judge was comprehensively addressed by the United States Supreme Court in Northern Pipeline Construction *1302 Co. v. Marathon Pipe Line Co., 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982). Northern Pipeline involved a state law damages action for breach of contract and warranty filed by a Chapter 11 debtor, Northern Pipeline Construction Company, in a United States Bankruptcy Court. Jurisdiction in the bankruptcy court was premised on § 241(a) of the Bankruptcy Reform Act of 1978 (“1978 Act”) which conferred jurisdiction on the bankruptcy court over all “civil proceedings arising under title 11 or arising in or related to cases under title 11.” 28 U.S.C. § 1471 (Supp. IV 1976). The defendant, Marathon Pipe Line Company, moved to dismiss the action on the ground that the 1978 Act unconstitutionally conferred Article III judicial power upon judges who lacked life tenure and protection against salary diminution. The Supreme Court agreed with Marathon’s position and, in a decision which did not command a majority opinion, affirmed the dismissal of the suit.
Before finding that the bankruptcy court as constituted under the 1978 Act could not constitutionally exercise the jurisdiction conferred on it by the 1978 Act, the plurality opinion in Northern Pipeline first considered when and why the Supreme Court had previously made exceptions to the general rule that federal judicial power is to be exercised only by Article III judges. According to the Northern Pipeline plurality, exercise of federal judicial power by a non-Article III officer has been upheld in two types of potentially analogous cases: those involving the adjudication of “public rights” and those in which the non-Article III decision maker acted as an “adjunct” to an Article III court. The plurality concluded that the bankruptcy court jurisdiction at issue violated Article III because it could not be sustained under either the public rights or adjunct court doctrines. However, the concurring opinion did not fully join in the plurality’s adjunct court and public rights analysis; a majority of the Justices could only agree that the particular claim before it could not be adjudicated by the bankruptcy court as then constituted. See Thomas v. Union Carbide Agricultural Products, 473 U.S. 568, 584, 105 S.Ct. 3325, 3335, 87 L.Ed.2d 409 (1985) (“The Court’s holding [in Northern Pipeline] establishes only that Congress may not vest in a non-Article III court the power to adjudicate, render final judgment, and issue binding orders in a traditional contract action arising under state law, without consent of the litigants, and subject only to ordinary appellate review.”); accord Commodities Futures Trading Comm’n. v. Schor, — U.S.-, 106 S.Ct. 3245, 3251, 92 L.Ed.2d 675 (1986). Subsequent majority holdings of the Supreme Court have recognized that the adjunct court and public rights doctrines embody valid, if not the exclusive, principles governing the determination of when and under what conditions a particular proceeding may be referred to non-Article III officers for adjudication. See, e.g., Thomas v. Union Carbide Agricultural Products Co., 473 U.S. 568, 588-89, 105 S.Ct. 3325, 3337-38, 87 L.Ed.2d 409 (1985) (majority opinion applying public rights doctrine). We will accordingly consider both the adjunct court and public rights doctrine as explicated by the plurality in Northern Pipeline in determining the merit to Munn’s argument that the bankruptcy court’s jurisdiction over this proceeding violates Article III.
The public rights doctrine derives from a group of cases in which the Supreme Court has upheld the constitutionality of legislative courts and administrative courts. The doctrine, as construed in Northern Pipeline, is limited to matters arising “between the Government and persons subject to its authority in connection with the performance of the constitutional functions of the legislative or executive departments” and which “historically could have been determined exclusively by those departments.” Northern Pipeline, 458 U.S. at 67-68, 102 S.Ct. at 2869-70, quoting Crowell v. Benson, 285 U.S. 22, 50, 52 S.Ct. 285, 292, 76 L.Ed. 598 (1932) and Ex parte Bakelite Corp., 279 U.S. 438, 458, 49 S.Ct. 411, 416, 73 L.Ed. 789 (1929). As the plurality explained, “[t]he understanding of these cases is that the Framers expected that Congress would be free to commit such matters completely to nonjudicial executive *1303 determination, and that as a result there can be no constitutional objection to Congress’ employing the less drastic expedient of committing their determination to a legislative court or an administrative agency.” 458 U.S. at 68,102 S.Ct. at 2870. Pursuant to the public rights doctrine, the Supreme Court has, the plurality found, upheld Congress’ establishment of summary procedures, outside of Article III courts, to collect a debt due to the government from one of its customs agents, Murray’s Lessee v. Hoboken Land & Improvement Co., 59 U.S. (18 How.) 272, 15 L.Ed. 372 (1856), cited in Northern Pipeline, 458 U.S. at 68, 102 S.Ct. at 2870, and has found that the Court of Customs Appeals had been properly constituted by Congress as a legislative court. Ex parte Bakelite, 279 U.S. 438, 49 S.Ct. 411 cited in Northern Pipeline, 458 U.S. at 68-69, 102 S.Ct. at 2870.
In Northern Pipeline, Northern Pipeline argued that a discharge in bankruptcy was a public right, similar to such congressionally created benefits as “radio station licenses, pilot licenses, or certificates for common carriers.” 458 U.S. at 71, 102 S.Ct. at 2871. However, because the suit at issue in Northern Pipeline was between two private parties concerning only their respective liability under the law, the plurality found it could not be viewed as a public rights suit: “[I]t suffices to observe that a matter of public rights must at a minimum arise ‘between the government and others.’ [Ex,parte Bakelite, 279 U.S. at 451, 459, 49 S.Ct. at 413, 416.] In contrast, ‘the liability of one individual to another under the law as defined,’ Crowell v. Benson, [285 U.S.] at 51 [52 S.Ct. at 292,] is a matter of private rights.” Northern Pipeline, 458 U.S. at 69-70, 102 S.Ct. at 2870-71. However, the plurality found that some bankruptcy proceedings may fall within the public rights exception: “[T]he restructuring of debtor-creditor relations, which is at the core of the federal bankruptcy power, must be distinguished from the adjudication of state-created private rights, such as the right to recover contract damages that is at issue in this case. The former may well be a ‘public right,’ but the latter obviously is not.” Northern Pipeline, 458 U.S. at 71, 102 S.Ct. at 2871.
The plurality derived the adjunct court exception to Article III from two cases, Crowell v. Benson, 285 U.S. 22, 52 S.Ct. 285, 76 L.Ed. 598 (1932) and United States v. Raddatz, 447 U.S. 667, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980). At issue in Crowell was a congressional scheme which empowered an administrative agency, the United States Employees’ Compensation Commission, to make initial factual determinations pursuant to a federal statute requiring employers to compensate their employees for work-related injuries occurring upon the navigable waters of the United States. The Commission’s “judicial power” was, however, limited in several ways. One, the federal statute administered by the Commission provided for compensation of injured employees “irrespective of fault” and prescribed a fixed and mandatory schedule of compensation. Crowell, 285 U.S. at 38, 52 S.Ct. at 287, cited in Northern Pipeline, 458 U.S. at 78, 102 S.Ct. at 2875. As a consequence, the Commission was left with the limited role of determining “questions of fact as to the circumstances, nature, extent and consequences of the injuries sustained by the employee for which compensation is to be made.” Crowell, 285 U.S. at 54, 52 S.Ct. at 293, cited in Northern Pipeline, 458 U.S. at 78, 102 S.Ct. at 2875. The Court found that in view of these limitations upon the Commission’s functions and powers, its determinations were “closely analogous” to those “made, according to familiar practice, by commissioners or assessors.” Crowell, 285 U.S. at 54, 52 S.Ct. at 293, cited in Northern Pipeline, 458 U.S. at 78, 102 S.Ct. at 2875. Observing that “there is no requirement that, in order to maintain the essential attributes of the judicial power, all determinations of fact in constitutional courts shall be made by judges,” the Court held that the judicial power exercised by the Commission did not violate Article III. Crowell, 285 U.S. at 54, 52 S.Ct. at 293, cited in Northern Pipeline, 458 U.S. at 78, 102 S.Ct. at 2875.
The second case upon which the plurality premised its adjunct court exception to Ar- *1304 tide III, United States v. Raddatz, upheld the practice, authorized by the 1978 Federal Magistrates Act, of referring certain pre-trial criminal motions, including motions to suppress based on alleged violations of constitutional rights, to a magistrate for initial determination. According to the Northern Pipeline plurality, the Raddatz court found that this practice did not run afoul of Article III because two provisions of the Magistrates Act ensured that ultimate decision making authority respecting the pre-trial motions remained with Article III judges: (1) under the Act, the magistrate’s proposed findings and recommendations were subject to de novo review by the district court, which was free to rehear the evidence or call for additional evidence; and (2) the Act specified that the magistrates were appointed, and subject to removal, by the district court. Northern Pipeline, 458 U.S. at 79, 102 S.Ct. at 2875.
In reviewing Crowell and Raddatz, the Northern Pipeline plurality found that the two cases established two principles relevant in determining the extent to which Congress may constitutionally vest judicial power in adjuncts to Article III courts. One, the plurality found, when Congress creates a substantive federal right, it possesses substantial discretion to prescribe the manner in which that right may be adjudicated — including the discretion to assign to an adjunct some functions historically performed by judges. This principle, the plurality found, underlies the result in Crowell:
[I]t is clear that when Congress creates a substantive federal right, it possesses substantial discretion to prescribe the manner in which that right may be adjudicated.... Thus Crowell recognized that Art. Ill does not require “all determinations of fact [to] be made by judges,” [citation omitted]; with respect to congressionally created rights, some factual determinations may be made by a specialized factfinding tribunal designed by Congress, without constitutional bar_[citation omitted].
Northern Pipeline, 458 U.S. at 80-81, 102 S.Ct. at 2876-77.
The second principle the plurality inferred from the cases is that the adjunct must be limited in such a way that “the essential attributes” of judicial power are retained in the Article III court. This principle, the Court found, was embodied in both Crowell and Raddatz:
Thus in upholding the adjunct scheme challenged in Crowell, the Court emphasized that “the reservation of full authority to the court to deal with matters of law provides for the appropriate exercise of the judicial function in this class of cases.” [Citation omitted]. And in refusing to invalidate the Magistrates Act at issue in Raddatz, the Court stressed that under the congressional scheme “ ‘[t]he authority — and the responsibility — to make an informed, final determination ... remains with the judge,’ ” [citation omitted]; the statute’s delegation of power was therefore permissible, since “the ultimate decision is made by the district court,” [Citation omitted].
Northern Pipeline, 458 U.S. at 81, 102 S.Ct. at 2877.
In applying the foregoing analysis, the plurality in Northern Pipeline found that the first principle — that Congress has greater discretion in prescribing the manner in which rights of its own creation are determined — was of no assistance to Northern Pipeline’s position because the lawsuit at issue involved state, and not federally created, rights. “[W]hile Crowell certainly endorsed the proposition that Congress possesses broad discretion to assign fact finding functions to an adjunct created to aid in the adjudication of congressionally created rights, Crowell does not support the further proposition ... that Congress possesses the same degree of discretion in assigning traditionally judicial power to adjuncts engaged in the adjudication of rights not created by Congress.” Northern Pipeline, 458 U.S. at 81-82, 102 S.Ct. at 2876-77. The plurality found this distinction to be of particular constitutional significance because the separation of powers doctrine embodied in Article III is less threatened where the right at issue is con-gressionally created:
*1305 [The distinction between rights created by Congress and state created rights] seems to us to be necessary in light of the delicate accommodations required by the principle of separation of powers reflected in Art. III. The constitutional system of checks and balances is designed to guard against “encroachment or aggrandizement” by Congress at the expense of the other branches of government. [Citation omitted]. But when Congress creates a statutory right, it clearly has the discretion, in defining that right, to create presumptions, or assign burdens of proof, or prescribe remedies; it may also provide that persons seeking to vindicate that right must do so before particularized tribunals created to perform the specialized adjudicative tasks related to that right. Such provisions ... are ... incidental to Congress’ power to define the right it has created. No comparable justification exists, however, when the right being adjudicated is not of congressional creation. In such a situation, substantial inroads into functions that have traditionally been performed by the Judiciary cannot be characterized merely as incidental extensions of Congress’ power to define rights it has created. Rather, such inroads suggest unwarranted encroachments upon the judicial power of the United States, which our Constitution reserves for Art. Ill courts.
Northern Pipeline, 458 U.S. at 83-84, 102 S.Ct. at 2877-78.
The Northern Pipeline plurality also found that the delegation of jurisdiction to the bankruptcy judges under the Bankruptcy Reform Act of 1978 was far greater than the delegations approved in Crowell and Raddatz and that as a consequence the 1978 Act could not be upheld on the ground that Article III judges retained under the Act “the essential attributes” of judicial power. In reaching this conclusion, the plurality emphasized that the subject matter jurisdiction of the bankruptcy courts under the Act encompassed not only traditional matters of bankruptcy, but also “all civil proceedings arising under title 11 or arising in or related to cases under title 11.” Northern Pipeline, 458 U.S. at 85, 102 S.Ct. at 2878 (emphasis in plurality opinion). The plurality also noted that the Act permitted bankruptcy judges to exercise powers “far greater” than those lodged in the adjunct schemes approved in Crowell and Raddatz in that the Act permitted bankruptcy judges to issue and enforce orders without resort to the district court and allowed for review of bankruptcy court judgments only under a “clearly erroneous” standard. Id. at 85-86, 102 S.Ct. at 2878-79.
In response to Northern Pipeline, Congress enacted the Bankruptcy Amendments and Federal Judgeships Act of 1984 (“1984 Act”). This is the statutory scheme presently in effect and under which the claim here at issue arises. Comparison of the 1984 Act with the 1978 Act, as well as review of the legislative history of the 1984 Act, reveals that in attempting to bring bankruptcy procedures within the limitations of Article III, Congress shaped the 1984 Act with both the public rights and adjunct court doctrines in mind. In apparent response to the distinction made by the Northern Pipeline plurality between core bankruptcy proceedings, which “may well be” within the public rights exception, and non-core proceedings, which are not, Congress provided separate procedures in the 1984 Act for adjudication of what are deemed to be “non-core” proceedings. See supra, page 1298. Whereas the 1978 Act conferred broad powers on bankruptcy courts to determine core and non-core proceedings alike, non-core proceedings can, under the 1984 Act, be referred to bankruptcy judges only for recommended findings subject to de novo review by a district judge. 28 U.S.C.A. § 157(c)(1), (2) (West Supp.1987). Core proceedings on the other hand are treated no differently than matters referred to bankruptcy judges under the 1978 Act: the decision of the bankruptcy judge is reviewable by an Article III judge only by an appeal governed by the same rules applicable to appeals taken to the courts of appeals from the district courts. 28 U.S.C.A. §§ 157(b)(1), 158(a), (c) (West Supp.1987). Thus, because Congress *1306 has deemed an action by the trustee to set aside fraudulent conveyances as a “core proceeding,” 28 U.S.C.A. § 157(b)(2)(H) (West Supp.1987), the role of the bankruptcy judge in adjudicating the claim at issue here is essentially the same as it would have been under the 1978 Act.
The analysis in Northern Pipeline with respect to the adjunct court doctrine finds expression in the portion of the 1984 Act concerning the appointment of the bankruptcy judges. Under the 1978 Act the bankruptcy judges were appointed by the President, with the advice and consent of the Senate, while under the 1978 Act the bankruptcy judges are appointed by the appropriate court of appeals upon recommendation of the Judicial Conference. 28 U.S.C.A. § 152(a) (West Supp.1987). As noted by the plurality in Northern Pipeline, in Raddatz the Supreme Court found that referral of pre-trial motions to magistrates under the Magistrates Act of 1978 was constitutional in part because the magistrates were appointed under the Magistrates Act by Article III judges.
B. Analysis
There are several distinctions between this case and Northern Pipeline which are relevant to the consideration of whether the bankruptcy jurisdiction at issue in this case comes within either the public rights or adjunct court doctrines described in Northern Pipeline. One, this case arises under a different statutory scheme then that which was in effect at the time of Northern Pipeline. This is obviously a relevant distinction because, as discussed above, Congress enacted the present statutory scheme for the specific purpose of curing the constitutional problems of the scheme under which Northern Pipeline arose. Perhaps more importantly however, the nature of the claim at issue here is significantly different from the nature of the claim at issue in Northern Pipeline. The claim at issue here has been deemed by Congress to involve “core” issues concerning the restructuring of debtor-creditor relations while the claim at issue in Northern Pipeline was in the bankruptcy court merely because it was “related to” a case arising under Title 11. In addition, while it is state law that provides the rule of decision in both this case and Northern Pipeline, as will be discussed in greater detail below, the claim in this case has a relation to federal law which the claim at issue in Northern Pipeline did not have.
Despite the distinctions between this case and Northern Pipeline, Northern Pipeline unquestionably provides an important frame of reference for determining whether the manner prescribed by Congress for adjudicating the bankruptcy proceeding at issue here is acceptable under Article III. However, in determining the constitutional significance of the distinctions between this case and Northern Pipeline, we need not decide if this case neatly falls within the Northern Pipeline plurality’s definitions of either the public rights or the adjunct court doctrines. Although the plurality in Northern Pipeline gave separate and alternative application to the public rights doctrine and the adjunct court doctrine when determining whether the bankruptcy jurisdiction there at issue violated Article III, this categorical approach to applying Article III doctrines did not then and does not now command the support of a majority of the Justices. See Northern Pipeline, 458 U.S. at 91, 102 S.Ct. at 2882 (Rehnquist, J., concurring) (“[It is not necessary to] decide whether these cases in fact support a general proposition and three tidy exceptions, as the plurality believes.... ”); see also Thomas v. Union Carbide Agricultural Products Co., 473 U.S. 568, 584-86, 105 S.Ct. 3325, 3335-36, 87 L.Ed.2d 409 (1985). As the Supreme Court has noted, “practical attention to substance rather than doctrinaire reliance on formal categories should inform application of Article III.” Thomas v. Union Carbide Agricultural Products Co., 473 U.S. at 586-87, 105 S.Ct. at 3336. Accordingly, in determining the amount of judicial involvement required by Article III in this case, our primary concern is not mechanical application of the public rights or adjunct court doctrines, but is rather the determination of whether the rationales underlying those doctrines are applicable in *1307 this case to a sufficient degree to satisfy Article III.
Munn argues that the power to set aside fraudulent conveyances is not at the core of the federal bankruptcy power in that Northern Pipeline “establishes that actions to bring property into the estate are not ... integral to the restructuring of debtor-creditor relations.” However, Munn’s characterizations of the holding of Northern Pipeline and the trustee’s suit are misleading. It is true that the trustee is, like the debtor in Northern Pipeline, seeking to bring property into the estate. However, the trustee here, unlike the debt- or in Northern Pipeline, is acting pursuant to his duty under federal bankruptcy law to gather property into the estate on the behalf of creditors of the debtor to facilitate the restructuring of creditor-debt- or relations. The suit at issue in Northern Pipeline on the other hand was not inherently connected to the debtor’s bankruptcy. That suit sought to gather assets into the estate; it did not do so on behalf of creditors nor did it seek to determine or adjust any of the debtor’s relations with its creditors.[4] In short, the right at issue here, unlike the right at issue in Northern Pipeline, directly relates to the restructuring of debtor-creditor relations and is not merely an action to bring property into the estate. Munn fails to offer, and we do not see, any compelling reason why the congressional determination that this type of suit is a core proceeding should be upset.
Of course the fact that this suit has properly been designated as a core proceeding would not justify the bankruptcy court’s jurisdiction over the matter if we were to find that, contrary to the suggestion of the plurality in Northern Pipeline, the restructuring of debtor-creditor relations is not a public right. As noted above, the public rights doctrine, as construed by the Northern Pipeline plurality, is limited to matters arising “between the Government and persons subject to its authority in connection with the performance of the constitutional functions of the legislative or executive departments” and which “historically could have been determined by those departments.” Northern Pipeline, 458 U.S. at 67-68, 102 S.Ct. at 2869-70, quoting Crowell v. Benson, 285 U.S. 22, 50, 52 S.Ct. 285, 292, 76 L.Ed. 598 (1932) and Ex parte Bakelite Corp., 279 U.S. 438, 458, 49 S.Ct. 411, 416, 73 L.Ed. 789 (1929).
While the Supreme Court now recognizes that the presence of the government as a party of record is not an absolute requirement of the public rights doctrine, Union Carbide, 473 U.S. at 586, 598, 105 S.Ct. at 3337 (majority and concurring opinions), the rights determined in connection with the granting of a discharge in bankruptcy do not fit easily within the Northern Pipeline plurality’s definition of the public rights doctrine. The administration of a bankrupt’s estate has never been committed exclusively to the legislative or executive branches and we would have great difficulty in concluding that it “could have been.” Unlike such congressionally created benefits as radio station licenses, pilot licenses or certificates for common carriers, the grant of a discharge in bankruptcy directly alters and often abrogates pre-ex-isting, legally cognizable property rights. It would be foreign to our constitutional system to allow the type of property rights ordinarily possessed by creditors to be determined exclusively by the legislative or executive branches of government. See International Union v. Keystone Consolidated Industries, 793 F.2d 810, 817 (7th Cir.), cert. denied, — U.S.-, 107 S.Ct. 403, 93 L.Ed.2d 356 (1986) (employer’s entitlement to waiver of ERISA funding requirements which would abrogate rights in collective bargaining agreement cannot be determined by non-Article III agency).
Nevertheless, we believe the rationale underlying the public rights doctrine has at *1308 least some applicability to the proceeding at issue here. The public rights doctrine in large part simply constitutionalizes the historical understanding of what need and need not be committed to Article III officers for determination. See Commodity Futures Trading Comm’n. v. Schor, — U.S. -, 106 S.Ct. 3245, 3258, 3259, 92 L.Ed.2d 675 (1986) (Article III requirements more strictly applied where matters traditionally tried in Article III courts are at issue); In re Arnold Print Works, Inc., 815 F.2d 165, 169 (1st Cir.1987). While, as indicated above, it has always been understood that the property rights of creditors cannot be committed exclusively to the political branches for determination, by the same token it has always been understood that bankruptcy proceedings need not be solely determined by Article III officers. Arnold, 815 F.2d at 169. Given the historical understanding of how bankruptcy proceedings are to be determined, we find that adjudication of core bankruptcy proceedings requires less Article III supervision then does adjudication of claims merely “related to” a bankruptcy proceeding. Thus, the fact that Congress has properly designated the claim at issue here as a core proceeding militates in favor of upholding the manner Congress has prescribed for the adjudication of the claim.
We also find that the first principle inferred by the Northern Pipeline plurality from Crowell — that Congress has greater discretion in prescribing the manner in which a right of its own creation is determined than it has with respect to rights not of its own making — has application in this case. As related above, in Northern Pipeline the plurality found that this principle was not applicable in the case before it because the claim at issue arose from state law. Insofar as the claim at issue here undeniably implicates state law, it is arguable that in this case we too should conclude that a principle concerning determination of congressionally created rights is inapplicable. However, for the reasons set forth below, we believe that the relation the claim at issue here has to federal law is sufficient to entitle Congress to greater discretion in determining how the claim is to be adjudicated than it is allowed with respect to a purely state claim.
Ordinarily of course, creditors’ rights, like the creditor’s right at issue here, arise from state law. However, the power of the states to create creditors’ rights is subordinate to the power of Congress, conferred by Article I, § 8, clause 4 of the Constitution, to establish uniform bankruptcy laws. Congress can, and often has, exercised its bankruptcy power to modify, or even abrogate, creditors’ rights in the independent federal interest of providing an equitable restructuring or liquidation of a bankrupt’s estate. This case involves an instance in which Congress has exercised its bankruptcy power by assuming control of the private, state-created right of creditors to set aside a fraudulent conveyance and vesting that right in the trustee. Thus, even though the right here initially arises from state law, because it pertains to a debtor under the protection of the federal bankruptcy laws, the right is as dependent for its existence on federal law as it is on state law. Indeed the right that is at issue here belongs to the trustee pursuant to federal law, not to a specific creditor under state law.
It is nonetheless arguable that the fact that a creditor’s right is subject to the federal bankruptcy power does not mean that that right is actually created by Congress. However, even if this were true, it would not dissuade us from concluding that Congress should have greater discretion in determining the manner of adjudication of the right at issue here than it would have of a purely state based claim. When determining whether a right is of state or federal origin where the issue is if the right must be adjudicated by an Article III judge, the crucial consideration is not which sovereign created the right, but rather whether Congress utilized the right for federal purposes. Where, as was the case in Northern Pipeline, Congress authorizes a federal officer to determine a state right which is not directly related to a federal constitutional concern, federalism concerns give rise to the need, arguably recognized in Northern Pipeline, to ensure that the *1309 state right is adjudicated in accord with the policies the state sought to effectuate in creating the right. See Geras v. Lafayette Display Fixtures, Inc., 742 F.2d 1037, 1052 (7th Cir.1984) (dissenting opinion); but see Commodity Futures Trading Comm’n. v. Schor, — U.S.-, 106 S.Ct. 3245, 3261, 92 L.Ed.2d 675 (1986). When, on the other hand, Congress utilizes state law for federal purposes, the paramount concern is federal, not state, policy, even though Congress has chosen state law as a guideline for effectuating federal policy. As a consequence, when Congress utilizes a state law right for the purpose of effectuating federal policy, there is no reason why it should not be allowed at least some of the additional discretion in determining the manner in which the right is adjudicated that it is allowed with respect to “purely” federal rights.
Here it is clear that Congress conferred the right on the trustee to set aside conveyances which could be set aside under state law for the purpose of restructuring debt- or-creditor relations pursuant to the federal bankruptcy power.[5] While the rule of decision is supplied by state law, the concern in applying the rule is to effectuate the policy of federal bankruptcy law. The fact that Congress has chosen to look to state law in defining the trustee’s rights does not markedly lessen Congress’ discretion in determining how those rights are determined.
Finally, we find it relevant that this case arises under a scheme in which the non-Article III decision-maker is appointed by Article III judges whereas Northern Pipeline arose under a scheme in which the non-Article III decision maker was appointed by the President. The purpose of the lifetime tenure/no salary diminution requirement of Article III is in part to ensure that federal judges are independent of political pressure from the other branches of government. Where the non-Article III officer is appointed by Article III judges, there is less threat that exercise of “judicial power” will be unduly influenced by the executive or legislative branches. Northern Pipeline Construction Co. v. Marathon Pipe Line Co., 458 U.S. 50, 79 n. 30, 102 S.Ct. 2858, 2875 n. 30, 73 L.Ed.2d 598 (1982) (plurality opinion); Pacemaker Diagnostic Clinic of America v. Instromedix, 725 F.2d 537, 543 (9th Cir.), cert. denied, 469 U.S. 824, 105 S.Ct. 100, 83 L.Ed.2d 45 (1984).
Viewing together all the factors present in this case relevant to the determination of what Article III requires, we are satisfied that the manner prescribed by Congress for adjudication of the right at issue here does not violate Article III. Congress has found, and we agree, that this proceeding falls within the core of the federal bankruptcy power. We are not inclined to upset the historically-based presumption that Congress has substantial discretion in determining how core bankruptcy proceedings are to be adjudicated. The fact that the rule of decision in this case is provided by state law does not take away from the fact that this proceeding relates directly to the restructuring of the relationships between a debtor and its creditors which is at the core of the federal bankruptcy power. We also believe that although the right at issue here derives from state law, Congress has utilized the right to effectuate federal policy and that therefore Congress should be allowed some of the additional discretion in determining the manner in which the right is determined that it is allowed with respect to purely federal rights. Finally, we find it significant that Congress has provided for a substantial degree of separation of power by placing control over the employment of bankruptcy judges exclusively in the hands of Article III judges. The provision concerning the appointment of the bankruptcy judges en *1310 sures compliance with Article III to the extent that the right at issue here might not be considered a congressionally created public right.
C. Conclusion
The jurisdiction of the bankruptcy court pursuant to 28 U.S.C. § 157(b) does not in this case violate Article III. Accordingly, the order of the district court reversing the bankruptcy court’s order of dismissal is AFFIRMED and this case is REMANDED to the bankruptcy court for further proceedings.

. The trustee chose to seek relief under § 544(b) instead of § 548 probably because of the differing limitation periods governing § 548 and § 544(b). While § 548 governs only conveyances made within one year of the filing of a bankruptcy petition, actions to set aside fraudulent conveyances brought pursuant to California law under § 544(b) are subject only to the three year limitations period of California Code of Civil Procedure § 338(4). The conveyance challenged by the trustee was made on October 11, 1982 while the debtor did not file her bankruptcy petition until October 18, 1983. Thus, because the conveyance at issue here was made more than one but less than three years prior to the filing of the Chapter 7 bankruptcy petition by the debtor, the trustee could, and did, seek relief under California law pursuant to § 544(b) but could not seek relief under the federal fraudulent conveyance provision codified in § 548.

. Conveyances made for the purpose of defrauding creditors have long been void at common law. The first major statutory codification of the common law of fraudulent conveyances is that of 13 Elizabeth I Ch. 5 (1570). That statute provided, in substance, that every conveyance made to the end, purpose and intent to hinder, delay or defraud creditors is void. The Uniform Fraudulent Conveyance Act, approved by the National Conference of Commissioners on State Laws in 1918, is essentially a restatement of the statute of 13 Elizabeth. States which have not adopted the Uniform Fraudulent Conveyance Act or a similar version of the statute of 13 Elizabeth have recognized the statute of 13 Elizabeth as part of the common law. 11 U.S.C. § 548 is aimed only at such conveyances as would be fraudulent and voidable under common law or under the statute of 13 Elizabeth. Coder v. Arts, 213 U.S. 223, 242-43, 29 S.Ct. 436, 443-44, 53 L.Ed. 772 (1909) (applying statutory predecessor of 11 U.S.C. § 548).

. In re Castlerock Properties, 781 F.2d 159 (9th Cir.1986), does not counsel a different result. There this court held that a bankruptcy court does not have jurisdiction to enter judgment under § 157(b) on a state law counterclaim of a Chapter 11 debtor. In reaching this conclusion, the court commented that a proceeding should not be characterized as "core” if to do so would raise constitutional problems. Id. at 162. In Castlerock however the court found that the claim at issue did not fall within any of the specific categories of core proceedings enumerated in 28 U.S.C. § 157(b)(2)(B)-(N) and at most only “arguably" fell within one of the two catchall provisions of § 157(b)(2). Id. Here on the other hand we find that the claim at issue falls within § 157(b)(2)(H), which is one of the specific provisions of § 157(b)(2). While the principle that constitutional problems are to be avoided in the construction of statutes is apt where a catch-all provision is at issue, more apt in construing a specific provision of a statute is the principle that the will of the legislature underlying the provision is not to be ignored. Moreover, in Castlerock the court concluded that § 157(b) jurisdiction over the claim at issue would in fact be unconstitutional. 781 F.2d at 162. In this case we find that § 157(b) jurisdiction over the claim here at issue is not unconstitutional.

. Moreover, the contract suit in Northern Pipeline could have been brought whether or not the plaintiff was bankrupt. A fraudulent conveyance, though, can only exist if the conveyor is insolvent or about to become insolvent, and thus is inextricably tied to the bankruptcy scheme. See In re Kaiser, 722 F.2d 1574, 1582 (2d Cir.1983). If a conveyor enjoys good financial health, a conveyance cannot harm its creditors, who would thus have no cause of action to recover transfer.

. It is noteworthy that there is evidence that Congress utilized state law in the 1984 Act with the understanding that it was not preserving state rights but was rather expounding federal rights. "State law rights arising in core bankruptcy proceedings are functionally equivalent to congressionally created rights, because Congress has the power to modify State law rights in bankruptcy proceedings.... Indeed, the very purpose of bankruptcy is to modify the rights of the debtors and creditors, and the bankruptcy code authorizes the bankruptcy court to abrogate or modify State-created rights in many ways.” 130 Cong.Rec. HI 110 (daily ed. March 20, 1984) (statement of Rep. Kastenmeier).