SOUTHWEST CENTER FOR BIOLOGICAL DIVERSITY, a non-profit corporation; Greater Gila Biodiversity Project, a non-profit corporation; Peter Galvin, an individual; Ancient Forest Rescue, a non-profit organization; Biodiversity Legal Foundation, a non-profit corporation; Blue Mountain Biodiversity Project, a non-profit organization; Carson Forest Watch, a non-profit organization; Cove Mallard Coalition, a non-profit organization; Ecology Center, a non-profit organization; Forest Conservation Council, a non-profit organization; Forest Guardians, a non-profit organization; Friends of the Bow, a non-profit organization; Native Forest Network, a non-profit organization; Oregon Natural Resources Council, a non-profit corporation; Predator Project, a non-profit organization; Save The West, a non-profit organization; Siskiyou Regional Education Project, a non-profit organization; Southern Utah Wilderness Alliance, a non-profit corporation; T & E Inc., a non-profit organization; and Don Muller, an individual, Plaintiffs,

v.

Bruce BABBITT, Secretary of the Interior, Defendant.

No. CIV 94–2036–PHX RMB.

United States District Court, D. Arizona.

Feb. 22, 1996.

Matthew Gilbert Kenna, Durango, Co. and Daniel John Rohlf, Portland, OR, for plaintiff.

Michael A. Johns, Asst. U.S. Attorney; Janet Napolitano, U.S. Attorney and Teri R. Thomsen, U.S. Department of Justice, for Babbit.

Norman D. James, Jay Lawrence Shapiro, Phoenix, Arizona, for Intervenors/amici.

## ORDER

BILBY, District Judge.

### I.  INTRODUCTION

In this case, Plaintiffs seek to set aside the Fish and Wildlife Service's (FWS) June 16, 1992 decision as arbitrary and capricious under the Administrative Procedures Act, 5 U.S.C. § 706.  The FWS decision found that the September 26, 1991 petition to list the

northern goshawk west of the 100th meridian in the United States failed to present substantial information that listing may be warranted.[1]

Plaintiffs contend that the ESA, its legislative history and FWS's implementation of the statute do not support a listing test based principally on a "genetic criteria" test. Moreover, Plaintiffs argue that the administrative record establishes that FWS acted arbitrarily and capriciously when it reached a negative 90-day Finding on the petition to list goshawks in the western United States and in determining that the petition presented insufficient evidence of reproductive isolation and genetic differentiation. In contrast, Defendant asserts that FWS acted in accordance with the law and employed an appropriate definition of what constitutes a listable entity under the ESA.

■ The parties filed cross-motions for summary judgment. On March 15, 1995, the Court allowed *Amici* Apache County *et al.* to file an *amicus* brief in support of Defendant's summary judgment motion. Plaintiffs move to strike portions of *Amici*'s opening brief which reference two sources: *Northern Goshawk and Forest Management in the Southwestern United States, The Wildlife Society,* (1994) and *Science and the Endangered Species Act,* The National Research Council (NRC 1995). Plaintiffs' motion is granted as these references were not considered by the FWS and are therefore, not a part of the record below. Similarly, the Court's decision today does not rest on any policy not a part of the record below. Accordingly, Plaintiffs' Motion for Clarification is denied as moot. After due consideration of the record, pleadings and oral argument, the Court concludes that Plaintiffs' motion for summary judgment is granted and this matter remanded to FWS in accordance herein.

## II. UNDISPUTED FACTS AND PROCEDURAL HISTORY

The northern goshawk (*Accipiter gentilis*) is a short-winged, long-tailed hawk whose range extends from Alaska through Canada, Northern America and into Mexico. Its range in the contiguous United States is divided into two separate regions: (1) the forested east, including the Appalachian mountains and northern portions of the Great Lakes States; and (2) montane forests west of the 100th Meridian. The Great Plains of the United States serves as a geographic barrier to the goshawk because it intervenes between these two regions and support no goshawk. There are three subspecies of northern goshawk located in the western half of North America: *A.g. atricapillus, A.g. Laingi,* (Queen Charlotte), and *A.g. apache.* A.R. I.D.13 (Draft Report at 1.).

On July 19, 1991, a petition was submitted to FWS to add the northern goshawk in Utah, Colorado, New Mexico, and Arizona to the list of threatened and endangered species, under Section 4 of the Endangered Species Act ("ESA"). A.R. I.C.10. FWS denied that petition on January 7, 1992 on the basis that these goshawks were not a distinct population segment because the bird travelled outside the four-state area and interbred with birds also located outside this four-state area. 57 Fed.Reg. 546–48 (January 7, 1992). FWS recognized that there was evidence of a decline in numbers and placed the entire northern goshawk species on the Category 2 Candidate Species List and instituted status review for its own listing purposes. *Id.; see also* 56 Fed.Reg. 58810 (November 21, 1991).

On September 26, 1991, a coalition of environmental groups sent a letter to FWS requesting FWS amend the July 19th petition to consider listing northern goshawks west of the 100th meridian in the United States. A.R. I.D.1. FWS treated this letter as a new listing petition. I.A. 4, 28, 475.

The Phoenix Ecological Services District Office of FWS produced a draft opinion which found that the second petition presented substantial evidence that the petitioned action may be warranted. A.R. I.D.32. The Regional Office held a meeting in January, 1992 to debate the question of whether the goshawk was a listable entity.

---

1. Unless otherwise distinguished, any reference to the northern goshawk in this opinion refers to those of the species located west of the 100th meridian in the United States.

A.R. I.D.37. The consensus of the biologists at this meeting was that it was not a listable entity. A.R. I.D. 17, 18, 22–24, 27–31. Region I of FWS in response to the second listing petition noted that the range of the northern goshawk in the western United States is contiguous with the range in the eastern United States through Canada. A.R. I.D.27. Consequently, the draft decision of the Regional Office, dated April 2, 1992 recommended that the Service make a "not warranted" finding because the northern goshawk in the petitioned region did not meet the definition of a species, subspecies or a distinct population segment. A.R. I.D.19.

On June 16, 1992, FWS made a Finding, published in the Federal Register on June 25, 1992. FWS found that the petition failed to present substantial evidence that listing the northern goshawk was warranted. A.R. I.A.4.; 57 Fed.Reg. 28474–76 (June 25, 1992). FWS concluded that the petition failed to establish that the goshawk population was geographically isolated because the northern goshawk habitat is continuous from the western United States to the eastern United States through Canada. *Id.* FWS noted that while gene flow between the western and eastern habitat may be low because northern goshawks generally stay within a 30 mile area from their nesting sites, relatively little gene flow may be needed to keep the species from separating into subspecies. *Id.* FWS found that the petition had provided no evidence that genetic differentiation is occurring or has occurred.

The FWS Finding recognized that "the best available evidence also suggests that goshawks tend not to make significant movement for the crucial purpose of seeking new breeding sites." *Id.* FWS noted a study which found three banded adult male goshawks 100 to 1050 miles from their respective points of banding. *Id.* Consequently, FWS concluded that "the best available information suggest that goshawks are capable of considerable geographic movement, sometimes accomplish these movements, but also tend to remain near their breeding sites." *Id.* FWS determined that the petition failed to establish that the northern goshawks west

of the 100th meridian constituted a population that was distinctive from goshawks in the eastern United States. *Id.* Thus, FWS concluded that the northern goshawks west of the 100th meridian did not constitute a listable entity.

## III. STANDARD OF REVIEW

■ The actions of the Secretary of the Interior and his delegates are reviewed in accordance with the Administrative Procedure Act, 5 U.S.C. § 706. *Pyramid Lake Paiute Tribe of Indians v. United States Dept. of Navy,* 898 F.2d 1410, 1414 (9th Cir.1990). The reviewing court must first determine whether the language in the statute is clear. If the intent of Congress is clear, then both the court and the agency must give effect to the unambiguously expressed intent of Congress. *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984). If, however, the statute is "silent or ambiguous with respect to the specific issue," "the court does not simply impose its own construction on the statute ... Rather, ... the question for the court is whether the agency's answer is based on a permissible construction of the statue." *Id.* at 843, 104 S.Ct. at 2782. Administrative decisions must be upheld unless "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *Chevron,* 467 U.S. at 844, 104 S.Ct. at 2782.

■ The scope of judicial review under this standard is narrow, and the court is not permitted to substitute its own judgment for a reasonable interpretation made by the administrative decision-maker. *Chevron,* 467 U.S. at 844, 104 S.Ct. at 2782. "An agency interpretation of a relevant provision which conflicts with the agency's earlier interpretation is 'entitled to considerably less deference' than a consistently held agency view." *INS v. Cardoza–Fonesca,* 480 U.S. 421, 446 n. 30, 107 S.Ct. 1207, 1221, n. 30, 94 L.Ed.2d 434 (1987) (*quoting Watt v. Alaska,* 451 U.S. 259, 273, 101 S.Ct. 1673, 1681, 68 L.Ed.2d 80 (1981)).

## IV.  DISCUSSION

■ This case turns on the definition of "distinct population segment" as applied to the northern goshawk.  Under the ESA, a "species" is defined as "threatened" and must be listed when it "is likely to become an endangered species within the foreseeable future throughout all of a significant portion of its range."  16 U.S.C. § 1532(20).  "Species" is further defined to include "any subspecies of fish or wildlife or plants, and any distinct population segment of any species of vertebrate fish or wildlife which interbreeds when mature."  16 U.S.C. § 1532(16).  This definition of species which includes a "subspecies" is more expansive than that of a traditional scientific definition.  *See* Hill, *The Endangered Species Act: What Do We Mean by Species?*, 20 Envtl.Aff. 239 (1993).  Legislative history establishes that the ESA's broader definition is based on a consistent policy decision by Congress that the United States should not wait until an entire species faces global extinction before affording a domestic population segment of a species protected status.  *See* H.R.Rep. No. 412, 93d Cong., 1st Sess. 10 (1973) U.S.Code Cong. & Admin.News, 1973 at 2989, 2998;  Senate Report No. 151, 96th Cong., 1st Sess. at 7 (1979).  For example, the bald eagle while not listed in Alaska, has been listed in the lower 48 states.  Thus, the ESA allows the United States to adopt different management practices to ensure the appropriate level of protection for a species based on its actual biological status.  *See also,* Senate Report No. 151, 96th Cong., 1st Sess. at 7 (1979).

Section 4 of the ESA authorizes the Secretary of the Interior to make determinations on the status of various species under the ESA.  The Secretary is authorized to list a species as threatened or endangered upon any one or more of the following five factors:  (1) the present or threatened destruction, modification, or curtailment of its habitat or range;  (2) over-utilization for commercial recreational, scientific, or educational purposes;  (3) disease or predation;  (4) the inadequacy of existing regulatory mechanisms;  or (5) other natural or manmade factors affecting its continued existence.  16 U.S.C. § 1533(a)(1).  In making the determination, the Secretary must make the decision "solely on the basis of the best scientific and commercial data available."  16 U.S.C. § 1533(b)(1)(A).

Plaintiffs contend that FWS has historically interpreted the ESA to enable FWS to list populations as threatened or endangered without requiring evidence of genetic variation or geographic isolation.  As an example, they offer the case of the American alligator.

FWS listed the American alligator within Louisiana as both endangered and threatened and defined the different populations by parish boundaries.  The agency justified this split listing on the basis that "[s]ome populations ... are now at the point where the species could be best served by more flexible management programs."  40 Fed.Reg. at 44,-412 (1975).  The agency divided alligators into separate populations for listing purposes despite acknowledging that populations it had listed separately were "taxonomically and morphologically identical."  *Id.* at 44,-413–14.

In addition to management flexibility, FWS has also cited availability of data to justify differential treatment of populations.  In the case of sea turtles, the agency found that three species of turtles faced threats to their existence throughout their range.  The agency only had specific information on particular areas in Florida and Mexico establishing that portions of two species were in danger of extinction.  43 Fed.Reg. at 32,803 (1978).  Nonetheless, FWS listed the three species as "threatened," but designated populations in Florida and Mexico of two of the species as "endangered."  *Id.* at 32,801.

Defendant concedes that prior to 1978, FWS listed species such as the alligator and the bald eagle using different listing criteria.  The 1978 amendment of the ESA added the "distinct vertebrate population" language.  Hence, Defendant argues that the fact that FWS employs different listing standards post–1978 does not mean that the decision in this case was incorrectly decided.  Defendant asserts that in the last 25 years, the science of endangered species issues has improved and FWS has relied more on biology and less on geopolitical boundaries to make listing decisions.  Since the 1978 amendment, De-

fendant contends that FWS has repeatedly required evidence of geographical isolation and/or genetic differentiation in order to determine that a population species should be listed on the basis that it is a distinct population segment.

To support this contention Defendant cites the case of the Pacific fisher. On June 5, 1990, FWS received a petition to list the Pacific fisher, a large weasel, which had populations in both the Rocky Mountains in central Idaho and along the California, Washington and Oregon coasts. In its January 11, 1991, Finding, FWS found that the Pacific weasel population constituted a distinct population from the Rocky Mountain population. because weasels avoid open habitat. That finding was based on the fact that the Okanaogan Valley in Washington State and Canada and the Snake and Columbia Rivers effectively prevents migration between the two groups. A.R. I.C.8., 56 Fed.Reg. 1159 (1991). The decision nonetheless denied the petition because lack of scientific information concerning "habitat needs, population size and trends, and demographic parameters ..." precluded a conclusion that the Pacific fisher was likely to become endangered in the foreseeable future. *Id.* at 1161.

The Pacific fisher petition, however, contained no direct evidence that Pacific fishers were reproductively isolated or genetically different from Rocky Mountain fishers. Rather, FWS relied on a study which found an "extremely low" likelihood of genetic exchange between populations due to limited migration to support its assumption that genetic differences "probably" exist. *Id.* at 1160. Significant were the presence of three factors: (1) geographical distance; (2) ecological distance; and (3) behavioral distances. *Id.* at 1159. FWS was aware of the fisher decision when it issued its decision in this case. A.R. I.C.8.a. Yet, FWS found the goshawk petition deficient because it did *not* present evidence that the genetic differentiation has or is occurring.

The record in this case establishes that FWS's findings indicate, "substantial information exists which indicates northern goshawk population declines, and loss and/or modification of its habitat may be occurring, not only in the Southwest, but elsewhere in the United States. A.R. I.A.2. at 545. As a result of that determination, FWS declared goshawks throughout the U.S. as a candidate for ESA protection and initiated a status review of the species. *Id.* FWS, however, declared goshawks to be a "Category 2" species, which the agency defines as "taxa for which there is some evidence of vulnerability, but for which there are not enough data to support a listing proposal at this time. *Id.* FWS concluded that "[a] number of studies have found population declines and loss and modification of habitat are [ ] occurring, especially in western Northern America." *Id.*

References following this conclusion cite six scientific studies documenting declines in goshawk numbers and/or habitat in various western states. *Id.* One such reference is the Crocker–Bedford (1990) study concludes that "timber harvesting on the North Kaibab Ranger District [in Kaibab National Forests in Arizona] caused goshawks to decline from an estimated 260 nesting pairs to 60 pairs by 1988." *Id.;* A.R. III–7 at 269. Other studies in the administrative record document or reference goshawk population and habitat declines (mostly due to timber harvest) in California (A.R. III–4), New Mexico (A.R. III–10), Nevada (A.R. III–18), Oregon (A.R. III–46 and 64), Idaho (A.R. III–56), and regionally, (A.R. III–60) ("in the western United States there is concern that populations and reproduction of the goshawk are declining"). Thus, FWS had abundant information on goshawk declines in the West.

More importantly, two weeks prior to the decision at issue, FWS Deputy Director issued a draft "Interim Vertebrate Population Policy" (the "1992 draft policy") in an attempt to develop internal guidelines for defining populations eligible for ESA protections. This draft policy indicates in clear and certain terms that the primary factors to be used are: biological significance, ecological characteristics and geographical distributions.[2] Genetic or morphological distinctness is no longer required. Specifically, the draft policy specified that in order to qualify for

---

2. Note, these same factors were applied to the Pacific fisher as early as January, 1991.

listing consideration as a "distinct population segment," a grouping must meet one or more of the following four criteria:

1. It is significantly isolated from other members of the same species or subspecies (i.e., it rarely interbreeds with other populations);
2. It occupies an ecosystem that is in danger of destruction throughout all or a significant portion of its historical distribution, and the species or subspecies is not present in surrounding ecosystems;
3. It is the only occurrence of a species or subspecies within United States' jurisdiction; or
4. It can be defined by geopolitical boundaries that delineate an area (representing significant portion of the species or subspecies range) where exiting legal protection is inadequate to ensure its survival.

A.R. II.4. The policy further provided guidance in applying these factors:

*Biological significance, ecological characteristics, and geographical distribution are the primary factors* considered when evaluating the appropriateness of listing a population segment. Political boundaries, regulatory mechanisms and management are also considered. *Genetic or morphological distinctness may or may not be present or known; these factors may be considered but are not essential in making a determination.* In evaluating these attributes, the Service will all upon the best scientific data available.

*Id.* at 5. (emphasis added). Thus, according to the draft policy, a population is "biologically significant" if it is important in maintaining the viability of species or subspecies, or is "important in preventing further decline (or in assisting recovery, if listed) of the species or subspecies." *Id.* at 4.

Apparently, FWS has applied the above criteria. FWS recently listed the subspecies Louisiana black bear, despite acknowledging interbreeding with the American black bear. *See* 57 Fed.Reg. 588, 589 (1992). The Agency noted that since the Louisiana black bear was a recognized subspecies it could be listed despite a lack of "genetic differences" or "geographic isolation." *Id.* at 588–590. This is in contrast to Defendant's position that FWS would have to make these biological findings to list a distinct population segment of bears.

Another example, is the burrowing owl populations. In that case, FWS allowed differentiation with no direct evidence of genetic differences because the evidence "suggests that genetic mixing across wide areas may be infrequent." 59 Fed.Reg. at 63,977 (1994).

And yet another example, the bald eagle. FWS justified its proposal to separately list bald eagles in the Southwest with a bare assertion, unsupported by reference to any scientific study, that the eagle population in the southwestern U.S. "appears to be" reproductively isolated from other populations. 59 Fed.Reg. at 35,592. Thus, these examples provide evidence that FWS arbitrarily demanded concrete proof of genetic differentiation with the northern goshawk in contrast to a contrary course of conduct. The Court concludes that in many post–1978 cases, FWS made listing decisions regarding "distinct population segments" without requiring reproductive isolation or genetic differentiation as it did in this case. As such, the present Finding is not illustrative of a consistent position since 1978.

One of FWS's present problems with the goshawk stem from the term "distinct population segment." It is uncontested that the term "distinct population segment" is not mentioned in scientific literature, nor explicitly defined in the ESA. FWS has circulated several draft policies on the "distinct population segment" since 1978 in an attempt to develop criteria. At the time of oral argument no final policy had been adopted. Defendant argues that the Court should defer to FWS's construction of its authority to list distinct population segments as outlined in its negative finding on the goshawk petition.

The administrative record which includes FWS policy statements and other post–1978 listing decisions, establish that there *was* no clear and consistent policy to which this Court could defer. The administrative record herein contains three separate FWS draft policies construing the agency's listing authority. *See* A.R. II. 1, 3, and 6. These

widely divergent policies range from a one page list of criteria (A.R. II. 1) to a nine page memo and draft policy (A.R. II.6). Defendant informs the Court that yet another and presumably the most recent draft policy was published in the Federal Register on December 21, 1994. 59 Fed.Reg. 65884.

■ In the present case, FWS has apparently evaluated the two northern goshawk petitions presented by plaintiffs under different standards A.R. I.D. at 2. Plaintiffs contend that FWS's 90–day Finding is not consistent with the 1992 draft policy then in effect. Plaintiffs Brief at 9–12. Defendant does not dispute this fact but asserts that FWS properly applied the agency's 1991 draft policy which at the time FWS released its goshawk finding had only recently been superseded by the 1992 draft policy. Def.Br. at 8, n. 4; Am.Br. at 12–13. At a minimum, this reliance on an earlier draft policy (1991) and ignoring the current draft policy (1992) makes the agency Finding suspect. Not so, argues Defendant because even final draft policies do not have the force of law and consequently they can not be judicially enforced. *Citing Commodity Futures Trading Comm'n v. Schor,* 478 U.S. 833, 845, 106 S.Ct. 3245, 3254, 92 L.Ed.2d 675 (1986) (judicial deference not due re: draft regulations).

The Court finds this attitude incredulous. This means that the Defendant or his delegates may arbitrarily elect to follow any draft policy because the FWS cannot be subsequently held accountable to the chosen draft policy. The Secretary is mandated to make his decision "solely on the basis of the best scientific and commercial data available." 16 U.S.C. § 1533(b)(1)(A). Reliance on an earlier draft policy without considering the most recent data violates this provision. The position as that assumed by Defendant today further evidences the arbitrariness of the negative 90–day Finding. That is, that FWS may elect which draft policy to follow depending on a predetermined outcome. Without a final policy defining exactly what constitutes a distinct population segment, this perception certainly has merit. At a

minimum, when Plaintiffs provided the Secretary with a 60–day notice of intent to commence suit, the FWS should have re-visited their Finding using the criteria from the most recent draft policy which would have, as a matter of course, relied on the most current scientific data available. The petition may have been no more successful, but the FWS would have acted reasonably and in accordance with law.

■ At various stages of the litigation, Defendant was put on notice of the incongruency of the negative 90–day Finding with its own findings as well as the criteria set forth in the 1992 draft policy then in effect. Yet he chose to continue litigating this case. Therefore, the Court finds Defendant's action not substantially justified and an award of attorneys' fees appropriate.

The Agency has had since the 1978 Amendment to adopt a final policy on criteria for determining a "distinctive population segment." The preservation of endangered species is an important task. It is not for the Court to say at this time whether the lack of a final policy after eighteen years is an abuse of discretion.[3] *See Sierra Club v. Gorsuch,* 715 F.2d 653, 658 (9th Cir.1983) ("An agency's control over the timetable of a rulemaking proceeding is entitled to considerable deference."). A natural consequence, however, is inconsistent findings made based on conflicting draft policies. The Ninth Circuit has made it clear that the Court's task is to determine whether the agency "conducted a reasoned evaluation of the relevant information and reached a decision that although perhaps disputable, was not arbitrary or capricious. *Mount Graham Red Squirrel v. Espy,* 986 F.2d 1568, 1576 (9th Cir.1993) (*citing Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 378, 109 S.Ct. 1851, 1861, 104 L.Ed.2d 377 (1989)). The Court finds that Defendant has failed to conduct a reasoned evaluation based on the most current biological and scientific data available.

## V. CONCLUSION

Based on the foregoing,

---

**3.** As the Court was reviewing the final draft of this Order, Defendant submitted what is apparently his final policy clarifying the phrase "distinct population segment." Now at least on remand, Plaintiffs now know within which policy framework the petition will be tested.

IT IS ORDERED that Plaintiff's Motion for Summary Judgment is **GRANTED** to the extent that the U.S. Fish and Wildlife Service's negative 90–day Finding on the petition to list the northern goshawks west of the 100th meridian in the United States was arbitrary, capricious and unlawful;

IT IS FURTHER ORDERED that the U.S. Fish and Wildlife Service vacate its 90–day Finding that the petition to list northern goshawks in the western United States did not present substantial information indicating the proposed action may be warranted. This Finding is hereby remanded to FWS for a new 90–day determination.

IT IS FURTHER ORDERED that Plaintiffs' "Motion to Strike Portions of *Amici's* Brief" is **GRANTED**;

IT IS FURTHER ORDERED that Plaintiffs' Motion for Clarification is **DENIED AS MOOT**;

IT IS FURTHER ORDERED the Plaintiffs shall submit an application for attorneys' fees and costs within fourteen (14) days of the entry of judgment; Defendant may file a responsive pleading within fifteen (15) days after service of the application; any reply thereto is due ten (10) days after service of the responsive memorandum.